## FERDINAND C. LATROBE. JR., et al., *vs.* ANDREW J. DIETRICH et al.

*Testimony in Rebuttal in Equity—Bill to Vacate Contract for False Statements—Insufficient Evidence of Fraud—Delay in Disaffirming Contract—Executed Contract by Infant.*

A party to an equity cause should not be allowed to testify in rebuttal as to matters which were alleged in the bill as the principal ground of the relief asked for, and concerning which he could have given his testimony in chief before the evidence of the defendant was taken.

Plaintiffs, as partners, bought 250 of the 300 shares of a Foundry Company from the defendants, and after the business had been turned over to them filed the bill in this case asking that the contract be annulled on the ground of false statements made by the defendants concerning the business of the company. These statements were that the Foundry Company did an annual business of a certain amount; that a trial balance submitted to the plaintiffs showed a certain annual profit, and that the defendants would furnish to the company a certain amount of business monthly. Upon an examination of the evidence it is *held,* that these allegations are not sustained; also that the contract between the parties was made before the trial balance was produced; that the books of the company, which fully disclosed all of its affairs, were within the control of the plaintiffs before the transaction was completed, and that consequently the plaintiffs are not entitled to the relief asked for.

One who is induced by the fraud of another to make a contract is put to an election, when he discovers the fraud, either to avoid the contract or to abide by it. If he elects to avoid, he must act within a reasonable time after discovering the fraud; and if thereafter he deals with the subject-matter as his own property he cannot disaffirm the contract.

An infant and an adult, as partners, bought certain prop-
erty, and afterwards filed a bill to vacate the contract on the
ground of fraud. The evidence fails to show that any fraud
was practiced; and since the infant plaintiff had enjoyed the
benefit of the contract, which was executed, he cannot recover
from the defendant any part of the money paid by the part-
nership.

*Decided November 18th, 1910.*

Appeal from the Circuit Court of Baltimore City (Stock-
bridge, J.).

The cause was argued before Boyd, C. J., Pearce,
Schmucker, Burke, Thomas, Pattison and Urner, JJ.

*John E. Semmes* and *Joseph C. France* (with whom was
*Jesse N. Bowen* on the brief), for the appellants.

*S. S. Field* (with whom was *John S. Biddison* on the
brief), for the appellees.

Boyd, C. J., delivered the opinion of the Court.

Ferdinand C. Latrobe, Jr., by his father and next friend,
Ferdinand C. Latrobe, Sr., and John C. Shane filed a bill in
equity againts Andrew J. Dietrich and Hammond Dietrich
individually and as co-partners, trading as Dietrich Broth-
ers, by which the plaintiffs sought to have a transaction be-
tween Mr. Latrobe, Jr., and Mr. Shane, of the one part, and
the Dietrich Bros., of the other part, annulled and set aside.
We will refer to Messrs. Latrobe and Shane as appellants,
for although, by reason of the minority of Mr. Latrobe when
the bill was filed, he sued by his next friend, before the de-
cree below was passed he had reached his majority and the
appeal was taken on behalf of him and Mr. Shane.

The appellants purchased from the appellees two hundred
and fifty shares of the capital stock of the Baltimore Foundry

Co., for which they paid $10,000.00 cash, gave their four notes of $2,500.00 each, which were endorsed by Mr. Latrobe, Sr., and also gave a note of the Baltimore Foundry Co. for $15,000.00, making $35,000.00, the purchase price agreed upon for the two hundred and fifty shares. The total amount of the capital stock of that company was $30,000.00, and the appellees retained fifty shares of the par value of $100.00 each. The bill alleges that the appellees knowingly and intentionally made misrepresentations and false statements to the appellants for the purpose of inducing them to purchase the stock, and that the appellants, relying on the statements and representations, purchased the stock on the strength thereof. It is also alleged that Mr. Latrobe, Jr., was at the time of entering into the agreement under twenty-one years of age, and had not yet reached that age, and that in view of his infancy he was advised that he was entitled to have the contract set aside and rescinded, so far as he is concerned.

The testimony shows that the negotiations for the purchase were begun by a letter from George A. Finch, a member of the Baltimore Bar, who represented the appellants, addressed to the company, stating he had an inquiry from a client as to whether "your company and plant could be purchased". Mr. Andrew J. Dietrich, the president, who together with his brothers held the stock, called upon Mr. Finch in response to the letter and, after consulting with his brother Hammond, who was his partner, named $40,000.00 as the price. On August 31st, Mr. Finch wrote to Mr. Dietrich that he had communicated his message to his clients, "and would request that you send me at your earliest convenience not a detailed inventory, but a general statement of the property belonging to the Baltimore Foundry Co., with your valuation of each item mentioned in said statement." He further said that his clients thought the price rather high, but if he would send him "a general statement of the property at the foundry," together with his valuation, he would be glad to arrange at

an early date a meeting of his clients with him "for the purpose of arranging to take over the Company, if the price can be agreed upon."

The next day Mr. Dietrich replied that they did not feel inclined to give an itemized list at that time, unless it was agreeable to Mr. Finch for him to meet his clients, "and I would then bring with me a list showing the items that would go with the transfer of the property." The correspondence resulted in Mr. Latrobe meeting Mr. Dietrich in Mr. Finch's office the early part of September, when Mr. Dietrich gave him, as stated by Mr. Latrobe, "a pencil memorandum of the foundry and what was at the foundry. and he told me the price the foundry was for sale for." Mr. Latrobe said he had that statement until about the 15th of September, when he returned it to Mr. Dietrich. The aggregate of the valuations placed upon the various items in that statement by Mr. Dietrich was $31,753.00. They again met in Mr. Finch's office on September 24th, according to Mr. Latrobe. Of that interview Mr. Latrobe testified that: "Mr. Dietrich went into the foundry, and said one thing about the foundry, said it was doing a business of $150,000.00 a year and making a profit of $18,000.00, and I told him that I would close the deal, meaning of course to ask the consent of my partner." He also said that the terms were then agreed upon (which are above stated), and the consummation was reached on his part, subject to Mr. Shane's approval, and on Mr. Dietrich's part, subject to his brother's approval. At that interview Mr. Finch, Mr. A. J. Dietrich and Mr. Latrobe, Jr., were all that were present.

The misrepresentations relied on by the appellants are: First, that the defendants represented that the Baltimore Foundry Co. was doing an annual business of $150,000.00; second, that the defendants submitted to the complainants a trial balance which showed a profit for nine months of 1909 of $18,014.68; third, that the defendants represented that Dietrich Bros. would give the foundry company business

amounting to $5,000.00 per month, and in the testimony, although not alleged in the bill. it is also stated that it was represented that the company was making a profit of $18,-000.00 a year. We will consider those charges in the order in which we have mentioned them, together with certain other matters to be hereinafter referred to.

1. Mr. Dietrich was quite positive that he did not meet Mr. Latrobe at Mr. Finch's office on September 24th, but it is not material as to the exact day, as it was about that time. He does, however, positively deny that he ever told him that the company was doing a business of $150,000.00 a year, but admitted that at one of the meetings he did say that it was doing from seven to ten thousand per month. Mr. Finch is equally positive that Mr. Dietrich did not say that the business amounted to $150,000.00 a year, but his recollection is that he said it was $120,000.00. He was asked: "You don't remember what the amounts were, do you remember whether he said so much a year or so much a month?" and replied: "I can't recall that, but it is distinctly in my mind it was $120,-000.00 a year, whether he said $100,000.00 or $120,000.00 I can't recall. but the amount $120,000.00 is imbedded in my mind, but I am sure he did not say $150,000.00 or $180,-000.00." The only other testimony on that subject, in addition to that of Mr. Latrobe, was that of Mr. Shane. He spoke of making the $15,000.00 note by reason of the representation of $150,000.00 a year. but the following testimony was then given by him: "Q. Representation made by whom? A. Well, by my partner Ferdinand C. Latrobe. Q. As to the $150,000.00? A. The $150,000.00 and the $18,000.00 profit on that business of $150,000 0 a year. Q. Who made the representation as to the $150,000.00? A. At that time at one of the meetings at the foundry Mr. Dietrich and Mr. Latrobe and I were there together, and Mr. Dietrich on the balcony says, 'we were doing a business of $150,000.00 a year and being you and Mr. Latrobe are interested down here you ought to raise it to $180,000.00.' "

That testimony was given by Mr. Shane when called in re-buttal, and it was excepted to and ruled out by the Court below.  It was not proper evidence in rebuttal.  Courts of Equity should not draw fine distinctions between evidence that is properly in chief and that properly in rebuttal, but Mr. Shane was a party to this cause—was seeking the aid of the Court on serious charges made in the bill by him and Mr. Latrobe against the defendants, which not only might affect them financially but would reflect upon their char-acters, if true.  Although the allegations were made in the bill, that the defendants represented that the "company was doing a gross annual business of $150,000.00, which could be increased by judicious management to the sum of $180,-000.00 annually," and although that was specifically denied in the answer, Mr. Shane was not called as a witness in chief, but was called after the defendants concluded their testi-mony, and after Mr. Latrobe had testified in rebuttal.  To permit him to testify under such circumstances would be a dangerous precedent, and the Court below was unquestion-ably correct in ruling out his testimony, but even if it could be considered, Mr. Dietrich positively denied it and Mr. La-trobe did not sustain him as to such testimony on the occasion he spoke of.  Mr. Latrobe said the statement was made when Mr. Finch and Mr. Dietrich were present--on September 24th.

Mr. Finch testified that in the conversations he heard Mr. Dietrich and Mr. Latrobe agree that the purchasers could in-crease the business to $150,000.00 or $180,000.00 in the next year by reason of their facilities for handling and get-ting business.  It is, therefore, probable that Mr. Latrobe's impression as to the amount of the business said to have been done was received from confusing that with what was said could be done, but, however that may be, it cannot be said, in view of the testimony of Mr. Dietrich and Mr. Finch, that that charge is sustained by the evidence—on the contrary, it is shown by the weight of the evidence not to be correct.

The books of the company show, as alleged in the bill, what business was done,—being from something over $90,000.00 to a little over $117,000.00 per annum, averaging about $8,-000.00 per month, and it would be remarkable if parties engaged in a transaction of this character would rely on the statement of one of the vendors, when the books so clearly spoke for themselves. It might be possible that Mr. Latrobe. by reason of his lack of experience, would conclude a deal on the mere statement of one of the vendors, but the testimony shows that he had the benefit of the advice of those who would certainly know better. It is difficult to believe that if Mr. Dietrich be the character of man that even the appellants say he is, he would have been so foolish, if no higher motive influenced him, as to grossly misrepresent the amount of business done and the profits received, in order to induce the purchase, and then turn over the books to them five days before he and his brother were paid the $10,000.00 in cash, as he did. Any competent bookkeeper could surely have ascertained the facts in a day or two. Mr. Farley, the bookkeeper of the company, was retained by the new management and ought to have been able to give such infomation in that time, if not in much less time. In addition to that Mr. Bailey, an experienced accountant, was elected secretary and treasurer of the company, and whether he took advantage of it or not, had full opportunity to examine the books, or have them examined, from October 2nd, when he was elected secretary and treasurer, to October 7th, when the money was paid. Moreover, Mr. Bailey testified that at the meeting on October 2nd he asked that a statement be submitted before going furher in the transaction, and said that, "There was no definite plan or policy decided upon with regard to the terms of payment except that no payment should be made until we had an opportunity to look at the trial balance." It is almost inconceivable that if the amount of business done by the company was an inducing cause in concluding the purchase, one of his experience would have relied on a mere

trial balance as of October 1st, 1909, without ascertaining the amount of business done which a trial balance would not show. Moreover, there was no occasion for asking Mr. Dietrich to procure the trial balance, as it is admitted that the new officers were elected on October 2nd.

So from whatever standpoint we view the case, it is clear that the plaintiffs did not sustain the charge as to the amount of business done.

2. The testimony as to whether the defendants represented that the profits which had been made were $18,000.00 a year was ruled out by the Court below on the ground that there was no such allegation in the bill, but we will not discuss that ruling as we are satisfied the plaintiffs failed to establish the charge. What was said in reference to the representation as to the amount of business done is for the most part applicable to the one concerning the amount of profits, as both of those charges practically depend upon the same testimony.

But it is alleged in the bill that a trial balance as of October 1st, 1909, was furnished which showed a profit of $18,-014.68 for the nine months preceding that date, and it is contended that that was not only false, but was one of the inducements which led the appellants to purchase the stock, or at least that it misled them to believing that the company was making profits. Mr. Bailey who stated, as shown above, that no payment was to be until they could see the trial balance, admitted on cross-examination that he did not ask Mr. Dietrich for it, but he asked Mr. Latrobe to secure it. Mr. Finch, who was representing the appellants, said it did not enter into the negotiations at all, and the evidence does not satisfactorily explain who gave it to the appellants. Mr. Latrobe said in answer to "Who produced it?" "I think Mr. Dietrich, sir," but Mr. Dietrich positively denies that and some circumstances show that Mr. Latrobe was mistaken. He said that the trial balance was at Mr. Finch's office on October 6th. A letter dated October 7th from Mr. Bailey to Mr.

Finch is as follows: "Enclosed you will please find a state-
ment received by me from the Baltimore Foundry Company
showing the list of Accounts Receivable and Accounts Pay-
able amounting in the first instance to $15,368.48. and in the
second instance to $8,136.76, being open book accounts as of
October 1st, 1909, as reported by them. I also enclose a
statement dated October 1, 1909, showing the Assets and
Liabilities, including merchandise on the liability side, and
sundry expense items on the assets side. None of these ac-
counts have been verified, but it is understood that the
amounts are acceptable to the parties concerned." That letter
is signed by Mr. Bailey as "Secretary Baltimore Foundry
Company of Baltimore City." If the statement was in Mr.
Finch's office on the 6th, it is not easy to see why Mr. Bailey
sent it to Mr. Finch on the 7th. Mr. Farley testified that he
made the trial balance up on October 4th and he handed it to
a young man in the office and did not know what became of
it. It must be remembered that that was after the new man-
agement took charge, and the regular way would have been
for the "young man" to give it to Mr. Latrobe, as president,
if not to Mr. Bailey, as secretary and treasurer. Mr. Farley
said he had made up a trial balance every month, which was
kept in a book for that purpose, and, prior to the one on
October 1st, they were either mailed to or handed to Mr.
Dietrich. Mr. Dietrich was formerly the president of the
company, but on October 2nd Mr. Latrobe was elected presi-
dent, and hence the most reasonable explanation would be
that it was given to or sent to Mr. Latrobe, especially as Mr.
Bailey testified: "I think I asked Mr. Latrobe to try to secure
a statement." That was on October 2nd.

But if we pass that by without further comment, it is im-
possible to find from the testimony that the trial balance
authorized the charge in the bill that the defendants were
guilty of knowingly and intentionally making misrepresenta-
tions and false statements for the purpose of inducing them
to purchase the stock. In the first place we do not under-

stand how any one could thereby be misled into believing that
the company made $18,014.68 that year or during any other
particular period. Mr. Farley, the bookkeeper, testified that
no one can tell from a trial balance at the end of the month
whether there was any real profit or not. He was a witness
for the appellants, and as he was the bookkeeper who made
out the trial balance, his testimony ought to be convincing on
that subject.

A good deal was said at the argument about the Dietrich
Brothers marking off an indebtedness of $61,211.15, which
the company owed them, and it is alleged in the bill in con-
nection with the trial balance. That was done as of Septem-
ber 30th, and it is conceded that the books showed the whole
transaction. Mr. Bailey said he could have found out that
item in "a couple of seconds if I had taken the trouble to look
at the books." Mr. Finch testified that he told Mr. Dietrich
they did not want "any detailed inventory; we simply wanted
a general statement of the premises and property of the com-
pany because Mr. Latrobe had directed me to get a price on
the cost of the plant and for that reason he simply wanted
to take over the cost of the property and its capital stock,
without any assets or liabilities, not to take over the company
as a going concern with respect to all its property, debts,
and accounts due, company's bills and so on, but simply to
get an idea of what the company owned in the way of prop-
erty outside of the open account, and that letter was a request
for that particular statement." Again he testified that "Mr.
Dietrich said to Mr. Latrobe, You know, Mr. Latrobe, that
none of us have made any money in the foundry, and all that
we want the plant to do is to have our contracts well exe-
cuted, but there is practically no profit, just to keep the men
going and plant in business; and I think Mr. Latrobe replied
to that, that he knew that scarcely anyone had made any
money in the foundry business during the past year or more."
Again Mr. Finch said: "I told Mr. Dietrich my clients knew
pretty much about the Foundry Co.; that was told me by Mr.

Latrobe, he knew pretty much about it; he wanted to see the plant, and he saw the plant before the deal was closed, before the purchase price was agreed on, and Mr. Shane, I believe, examined the plant." He also said that Dietrich Brothers were to collect all accounts and pay all bills, and that "The transaction went through without any regard to the liabilities and assets and profits, as a basis of the transaction." It was undoubtedly necessary to cancel the indebtedness of the company to Dietrich Bros., if the appellants were to get the plant free from all liabilities. The appellants could not possibly be injured by that indebtedness being released, and if, as Mr. Finch's testimony shows, they were buying the plant regardless of profits, it cannot properly be said that the appellees suppressed material information by not telling the appellants of the indebtedness. At any rate, there is nothing to show that Mr. Dietrich had any reason to suppose that the appellants were interested in knowing that he had cancelled that debt and the books of the company clearly showed the whole transaction.

But regardless of all that, it cannot be doubted that the testimony shows that *the bargain* was concluded before the trial balance was furnished. Mr. Latrobe himself so testified, and they met on October 2nd for the purpose of consummating what was confessedly their agreement. Whether or not the four notes of $2,500.00 each were actually delivered on that day is not so material in our judgment as the parties seem to have thought, judging from the amount of testimony taken on the subject. The fact is that Mr. Latrobe was elected president, Mr. Shane vice-president and manager, Mr. Bailey secretary and treasurer and Mr. Finch a director on that day, and the new management was put in control Saturday afternoon, October 2nd, or on October 4th, at the latest. The four notes were certainly endorsed by Mr. Latrobe, Sr., on or before October 4th, and the various agreements were executed as of October 2nd, although some of them were in fact executed at a later date. This trial bal-

ance was not made until October 4th, and does not appear in the hands of any of the parties until October 6th or 7th. The cash was not paid until October 7th, and therefore there were at least four or five days before it was paid out after the appellants got control of and had in their possession the books of the company. If the theory of the appellants be correct, that the payment of the cash was postponed from October 2nd to October 7th, so they could get a statement of the affairs of the company, how could they better get it than from the books, which were in their possession or at least under their control? Can it be fairly said that the appellees were guilty of suppressing material facts—such as the $61,000.00 item—or of misrepresenting the true condition of the company's affairs, when the books not only disclosed everything, but were so kept that the truth could be ascertained from them as to some items in a few minutes, and as to all in at least a day or two, and the books were actually placed in the possession and control of the appellants several days before the transaction was finally consummated by payment of the cash, delivery of the balance of the stock and execution of some of the agreements? If it had been shown that Mr. Dietrich had falsely stated that they had made profits of $18,000 a year, and the appellants relied on that, that might be another matter, but as we have already said, the evidence in our judgment fails to establish it. If it had been shown that he had furnished the trial balance under circumstances from which it could be seen or inferred that he was attempting to mislead the appellants, and he had reason to believe the cash payment and final consummation of the transaction depended upon that, there might be some ground for the charge made against him and his brother; but as Mr. Finch who represented the appellants testified that the trial balance did not enter into the transaction, and especially as it was furnished at a time when the appellees were not in possession of the books, but the appellants were, it cannot be said that the appellees are to blame, much less that they were guilty of fraud,

even if the appellants were thereby misled, which the evidence does not establish.

It was suggested that the plant was not worth as much as the appellants agreed to pay for it, but under the circumstances disclosed by the record, there is certainly nothing to entitle them to relief on that account. If it be true that the cupolas or other property which the appellees sold them did not belong to them, it may be that in the appropriate tribunal the appellants would be entitled to some relief, but that is not involved, and not established in this case.

Without discussing the question, it is worthy of remark in this connection that fifteen thousand dollars of the thirty-five thousand dollars agreed to be paid were represented by the note of the company, which by the terms of the agreement in reference to it was to be paid in a way that practically relieved the appellants of personal liability, if the company did what it agreed to. As the appellees still hold one-sixth of the stock of the company, the appellants as the owners of the five-sixths would not have to bear all the burden of that note. But they cannot complain if they did make a bad bargain, in the absence of fraud or something kindred to it. *McShane* v. *Hazelhurst,* 50 Md. 131.

We might refer to other testimony and circumstances applicable to the questions already considered, but we have discussed them more at length than is usual or perhaps desirable. We will now as briefly as possible speak of the other questions raised.

3. The charge that the defendants represented that the amount of business which would be contributed to the company by Dietrich Brothers would be about $5,000.00 per month is sufficiently answered by the agreement on that subject, and requires no further comment.

4. It might well be questioned whether, even if we had reached different conclusions as to the facts which we have discussed, the plaintiffs would be entitled to relief by reason of their action after they discovered what they alleged to be

misrepresentations, etc.  There is undoubtedly evidence of conduct after that time which would be difficult to reconcile with a decision to elect to rescind the contract.  As was said in *Grymes* v. *Sanders,* 93 U. S. 55, "Where a party desires to rescind upon the ground of mistake or fraud, he must, upon the discovery of the facts, at once announce his purpose and adhere to it.  If he be silent, and continue to treat the property as his own, he will be held to have waived the objection and will be conclusively bound by the contract, as if the mistake or fraud had not occurred.  He is not permitted to play fast and loose.  Delay and vacillation are fatal to the right which had before subsisted."  It is true that an innocent party is not bound to rescind a contract, if entered into by reason of the fraud of the other party, but he is put to his election of acquiescing in the agreement, or of avoiding it. "But if after he discovers the fraud he remains silent, under circumstances in which silence would indicate acquiescence; or if he act or deal in relation to the subject-matter in such a mode as to imply a willingness to stand by his bargain, he is considered as ratifying it, and he cannot afterwards avoid it.  If he would avail himself of the fraud to avoid the contract, he must exercise his right of rescission immediately upon the discovery of the fraud, for if, after knowledge thereof, he deals with the subject-matter of the contract, as his own, he cannot repudiate the contract, although he should afterwards discover further circumstances connected with the same fraud."  *Story on Sales,* sec. 159, cited with approval in *Clements* v. *Smith,* 9 Gill, 156.  Or, as was said by Judge Alvey. in *Foley* v. *Crow,* 37 Md. 51, "It is well settled that applications for rescission must be made without delay, and that the party seeking to rescind must come to his election as soon as the cause for rescission is discovered, so that the parties to the contract may be placed as nearly in *statu quo* as possible.  This requirement is founded upon an obvious principle of justice."  So we might cite many other cases, but they are all to the effect that the original party must act

within at least a reasonable time after discovery of the fraud, and what is a reasonable time must be determined by the circumstances. One of the important reasons for requiring promptness in such cases is to enable the other party to be placed as nearly as possible in *statu quo*.

In this case the appellants knew substantially as much on October 21st as they did when the bill was filed, but they waited until the early part of December before even complaining to the appellees, and then did not indicate a determination to rescind the contract. When the management of an industry such as this foundry is transferred from one party to another, it is highly important that there be no unnecessary delay, if the purchaser proposes and intends to rescind the contract on the ground of alleged fraud. After the discovery of what is made the basis of the application to have the contract rescinded, the appellants continued to hold the offices to which they were elected as the result of the contract, the appellees still dealt with them under the terms of the agreement, the appellants were still collecting accounts that belonged to the appellees, and the appellees continued to loan them money. Other acts indicating an intention to abide by the contract, and not to rescind it, were done by the appellants. Such conduct was not in accordance with the position taken by them in this bill, and if we were compelled to pass on that question, we would be inclined to deny the appellants' relief on that ground, but as we reached the conclusions already announced as to the facts we will base our judgment on them.

5. Another question is the effect of the minority of Mr. Latrobe. We are of opinion that the Court below gave him all the relief he was entitled to. The evidence shows that he and Mr. Shane were partners, and he testified that the deal was with them as partners, and that the purchase was intended by them as a partnership purchase. A contract of partnership between an infant and an adult is not void, but only voidable. The infant can avoid it, but the adult cannot

rescind it, unless there be some ground for it other than the
mere infancy of his partner. It is likewise the law that an
adult is not relieved from liability because he has entered into
a joint obligation with an infant, and sureties, endorsers and
joint promissors are still liable, although an infant who is a
party may escape liability. 16 *Am. and Eng. Ency. of Law*,
297, and cases cited in the note. In *Bush* v. *Linthicum*, 59
Md. 344, this Court adopted the opinion of JUDGE MILLER,
who decided the case in the lower Court. That learned Judge
thus stated the law: "All the books upon partnership lay
down the proposition that an infant may become a partner
with an adult. It is a contract not absolutely void, but one
which the infant may stand to or repudiate at his election.
While he remains a partner he has the rights and powers of a
partner. He has equal right, with his co-partner, to the pos-
session of the assets of the firm, to collect the debts due it,
and he has also the power to contract debts in the name of the
firm, which, though he may himself subsequently repudiate
and get rid of responsibility therefor, are still binding upon
his co-partner." It might, therefore, well be questioned
whether this bill, which was filed by the two partners, could
have been entertained on the ground of the infancy of Mr.
Latrobe, as Mr. Shane could not for that reason be released,
but the appellees have raised no question as to the correctness
of the decree, and therefore we will not discuss the ques-
tion.

The money was paid, the stock delivered, and the appel-
less have executed their part of the contract in all particu-
lars. Inasmuch as we have held that the contract cannot be
rescinded by reason of the alleged misrepresentations, etc.,
there is nothing that could be done for Mr. Latrobe except
to discharge him from liability on the notes, unless he can
require repayment of the money already paid. But, as we
have seen, his infancy did not release Mr. Shane, and Mr.
Shane would certainly not be entitled to have the money paid
back simply because Mr. Latrobe was an infant. Presumably

it was partnership money, as it was paid by the partnership, and the rights of the respective partners to it are matters to be settled between them. It was said in *Brawner* v. *Franklin,* 4 Gill, 463 : "If the infant have already advanced money upon a contract, which is executory upon the part of the adult, he cannot disaffirm it, and sue the other party for the advance, whenever it was paid on a valuable consideration, which has been partially enjoyed, and especially, if he had received the benefit of his contract."

In *Adams* v. *Beall,* 67 Md. 53, this Court, through JUDGE ROBINSON, after citing some English cases to the effect that an infant after withdrawing from a partnership could not recover money paid by him as a consideration for being admitted into the partnership or for a lease of the premises occupied by the firm, held that, "Where money is paid by a minor in consideration of being admitted as a partner in the business of the appellant (the adult), and he does become and remain a partner for a given time, he ought not to be allowed to recover back the money thus paid, unless he was induced to enter into the partnership by the fraudulent representations of the appellant."

In *Wilhelm* v. *Hardman,* 13 Md. 140, the rule is thus announced, quoting from the syllabus: "Where an infant pays money on a voidable contract, and has enjoyed the benefit of it, he cannot avoid it and recover back his money; the rule which protects infants from liability on contracts will be allowed to operate reciprocally where it can be so applied. In cases where money has been paid by an infant, a distinction is always observed between those where he has derived no benefit from the money he sues to recover back, and those where the consideration has been partially enjoyed by him "

In this case the consideration was partially enjoyed by the infant, and he has derived such benefit from the money as precludes his recovery of it It matters not that the business was not successful. It was said in *Adams* v. *Beall. supra,* "The business was not, it is true, a successful one. but this,

in the *absence of fraudulent representations on the part of the appellant,* cannot affect the question."

We do not deem it necessary to discuss the exceptions to testimony, as what we have said about that of Mr. Shane is sufficient to indicate our views as to those to his evidence, and there is nothing in the others which could affect our decision, even if we had reached a different conclusion from the Judge below as to those exceptions.

So without further prolonging this opinion, we will affirm the decree below. As the appeal was taken by Mr. Latrobe, Jr., and Mr. Shane after the former reached his majority, we will direct the costs in this Court to be paid by them, and will follow the decree as to the costs below.

> *Decree affirmed, the costs below to be paid by John C. Shane and Ferdinand C. Latrobe, Sr., the next friend of Ferdinand C. Latrobe, Jr., and the costs in this Court to be paid by the appellants.*