WILLIAM A. K. RYAN *v.* JOHN
J. BRADY ᴇᴛ ᴜx.

\* \* \*

JOHN J. BRADY ᴇᴛ ᴜx. *v.* E. HOLMES
HAWKINS, JR. ᴇᴛ ᴀʟ.

\* \* \*

THE LATHAM COMPANY ᴇᴛ ᴀʟ. *v.* E.
HOLMES HAWKINS, JR. ᴇᴛ ᴀʟ.

[No. 136, September Term, 1976.]

*Decided December 2, 1976.*

42

The cause was argued before GILBERT, C. J., and THOMPSON and MOORE, JJ.

*Philip E. Nuttle, Jr.*, with whom were *John F. Hall* and *Nuttle & Hall* on the brief, for appellant Ryan.

*Ernest M. Thompson*, with whom were *Charles E. Wheeler* and *Miller, Wheeler, Thompson & Thompson* on the brief, for appellees and appellants Brady.

*Richard K. White, Jr.*, with whom were *Constable, Alexander & Daneker* on the brief, for appellees and cross-appellants E. Holmes Hawkins, Jr., et al.

*George J. Goldsborough, Jr.*, and *Roy B. Cowdrey, Jr.*, with whom were *Goldsborough, Franch & Collett* on the

brief, for appellants, cross-appellees The Latham Company et al.

MOORE, J., delivered the opinion of the Court.

This controversy arose out of the purchase for $240,000 of a small estate on the waters of Peachblossom Creek, in Talbot County. It is undisputed that the selling broker mistakenly described the western boundary of the property to the appellant purchaser, William A. K. Ryan, prior to the execution of the sales contract.[1] A little more than one year after the sale, Mr. Ryan brought suit for rescission of the deed and return of the purchase price, or, in the alternative, money damages. Joined as parties defendant were the vendors, John J. Brady and his wife, Carlyle; the selling broker, Jonathan S. Wilford, Jr., and his employer, The Latham Company; and E. Holmes Hawkins, Jr., and his firm, Walsh and Benson, Inc., with whom the vendors had listed the property on an exclusive basis. The Bradys filed third party claims against the individual and corporate realtors and the latter filed cross-claims against each other.

The gravamen of appellant's bill of complaint was that by virtue of the misrepresentation, he understood that he would receive .986 of an acre more than was actually conveyed to him, and that had he known the true location of the westerly boundary, he would not have purchased the property.[2] The chancellor, after receiving extensive testimony and numerous exhibits, filed a comprehensive written opinion in which he found that Mr. Ryan had, by his actions, waived his right to rescission. Damages were also denied, the court sustaining the defense of imputed knowledge of the actual boundaries prior to the execution by Ryan of the sales agreement which had been prepared by his

---

1. The precise nature of the error and the amount of acreage involved in the misrepresentation were, however, disputed points.

2. A plat of the property (and adjacent property) adapted from appellant's exhibits is appended to this opinion. It shows (a) the actual western boundary per 1957 recorded plat; (b) the western boundary as misrepresented by the selling broker, according to his testimony; and (c) the western boundary as claimed by Mr. Ryan, on the basis of *his* version of what the broker had disclosed. The chancellor found appellant's version unsupported and his finding is not challenged on this appeal.

own counsel. As an additional ground for the denial of compensation, the court found appellant's proof of damages wholly inadequate. For the reasons stated below, we affirm.

## I

The property involved contained between four and five acres of land, improved by a ten-year-old, three and one-half bath, five-bedroom house, with approximately 350 feet of frontage on Peachblossom Creek. It was originally listed for sale at $285,000.

In late 1972, appellant contracted to sell his own home and acreage located on Leeds Creek in Talbot County for the sum of $425,000, with transfer of possession to occur on or about June 15, 1973. He then began a search for a new residence, preferably in Talbot County, and during the early part of 1973 he was shown a number of properties by appellee, Jonathan S. Wilford, Jr. The latter was a broker with The Latham Company, the agency through which the appellant had sold his property on Leeds Creek.

In early March 1973, the appellee, John J. Brady, gave an exclusive listing to the realty firm of Walsh and Benson, Inc. for the sale of approximately 50 acres owned by himself and his wife located on Plaindealing Creek. At that time, apparently upon impulse, he added to the listing the words, "Also house on Peachblossom Creek, 5 BRMS, 3-1/2 BATHS, etc. $285,000 W&B excl." Broker Wilford subsequently obtained permission from E. Holmes Hawkins, Jr., a broker with Walsh and Benson and a friend of the Bradys, to show Mr. Ryan the Brady property. First, however, Wilford and Hawkins met at the property in order that Wilford could become familiar with the land and improvements. According to Wilford, Hawkins pointed out the boundaries of the property at that time. Hawkins described the western boundary as extending, in a straight line, from an iron pipe located on the northern boundary of a private road, at the north end of the property, southward to a locust post at the southwest terminus near the banks of Peachblossom Creek. When Wilford subsequently showed the property to

appellant Ryan, he related to Ryan the boundary information which he had received from Hawkins.

Ryan testified, however, that Wilford told him that the western boundary ran in a straight line from a stake lying somewhere between a stump and an oak tree along the southerly edge of the private road to the southwest terminus post. The stake, knowledge of the existence of which was denied by all other witnesses, including Brady's neighbor, Charles Berry, was estimated at trial by appellant's surveyor to be 137 feet west of the true location of the northwest corner of the Brady parcel, as shown by the 1957 recorded plat of survey.

Although Mr. Ryan was dissatisfied with the location of the kitchen in the house and also desired more acreage, he nevertheless decided to purchase the property for $240,000, $45,000 less than the asking price. Upon the acceptance by Brady of his verbal offer, communicated to Brady by Wilford, Ryan instructed his attorney, Philip E. Nuttle, Jr. of the law firm of Nuttle and Hall, to prepare the agreement of sale. As executed, on May 7, 1973, the agreement contained the following description:

> "BEING the same lands or premises shown on a plat of Kastenhuber and Anderson, Surveyors, entitled 'MAP SHOWING A PORTION OF "OAKLANDS" SURVEYED FOR DWIGHT H. LONGLEY, TALBOT COUNTY, MARYLAND, Scale 100 feet to 1 inch, March, 1957' which plat is recorded among the Plat Records of Talbot County in Liber No. 11, folio 28.
>
> AND being the same lands which were conveyed unto John J. Brady and Carlyle P. Brady, his wife, both of Talbot County, Maryland by deed dated December 20, 1961 and recorded among the Land Records of Talbot County in Liber 375, folio 341, and subject to the conditions and restrictions contained therein."

Settlement under the contract took place on June 20, 1973 at the offices of the attorneys, none of the principals being

present. The deed, executed by the Bradys on June 15, 1973, was also prepared by appellant's attorneys and contained a metes and bounds description, and a specific reference to the plat of survey specified in the agreement of sale. The trial testimony discloses that the actual drafting of the sales agreement and the deed was handled by John F. Hall, Esq., Mr. Nuttle's partner. Mr. Hall conceded that he must have seen a copy of the survey before the sales agreement was executed.

Shortly after Mr. Ryan took possession of the Brady property, in the latter part of July, 1973, he was mowing the grass along what he believed to be the westerly boundary of his property. His neighbor to the west, Charles H. Berry, approached him and good-naturedly thanked him for mowing the Berry property. A friendly conversation ensued concerning the location of the dividing line between the lots of the two neighbors. One or two days thereafter, Berry delivered to Ryan a copy of the plat of the Berry property and they attempted to locate the four monuments designating the eastern boundary of the Berry property (the same being the western boundary of the Ryan property), but were able to locate only the locust post marking the southeast extremity, and a concrete marker at the northeast corner. Neither Berry nor Ryan could ascertain with precision the location of their common boundary. Mr. Ryan thereafter went on vacation in South Carolina and had no further discussions on the subject with Mr. Berry. Neither, it appears, did Ryan communicate with Mr. Brady nor with his own counsel.

In September 1973, at Berry's request, appellee Brady assisted his former neighbor Berry in an endeavor to discover the west boundary markers of the Ryan property. They found the first and fourth and although they were unable to locate markers two and three, they drove two stakes into the ground at points which they believed represented the dividing line between the two properties. According to Berry, the two stakes were clearly visible from the Ryan home.

Things remained dormant until late March 1974, when

Ryan received the results of a survey of his property following the execution by him, on March 16, 1974, of a contract for the construction of a swimming pool. The survey was ordered by him to assure the pool's compliance with zoning setback requirements and also to ascertain the correct boundary lines of the property. Ralph A. Porter of Trappe, Maryland, who performed the survey, confirmed that the western boundary was as delineated on Mr. Berry's plat and, perhaps more significantly, that it precisely coincided with the recorded plat of March 1957, referred to in the agreement of sale and the deed between appellee Brady and appellant Ryan. Indeed, Mr. Porter was able to discover all but one of the four markers on the western boundary of the Ryan property.[3] Mr. Porter testified that the  acreage of the parcel was 4.270 acres and that the quantity of land between the western line, as Ryan thought it to be, and the actual location of the westerly line was 0.986 acres. The distance from the side door of the Ryan house to the actual western boundary line was 53.39 feet, whereas the distance to Mr. Ryan's imaginary western boundary line was 180 feet. The witness was not asked if he had determined the difference between the acreage conveyed and that which would have been conveyed had the western boundary been as described to Ryan by Wilford, according to Wilford's testimony. The chancellor in the course of his opinion stated, however, that this difference was four tenths of an acre.[4]

According to Ryan, he was outraged when he received the results of the survey on or about March 27, 1974, and immediately contacted Wilford by telephone. Wilford, in turn, contacted Hawkins and both of them expressed surprise about the discrepancy. James C. Latham, president

---

**3.** According to the witness, the concrete marker at the northwest corner was three-quarters of an inch above the ground and plainly visible; marker number two, separating the first two courses, was found buried under five or six inches of dirt; and marker number four, at the southwest terminus, was found along the shore in approximately its correct position. The third marker was not found.

**4.** This calculation was not explained by the court. It was not derived from any other testimony and it is contended by appellees, Hawkins and Walsh and Benson, Inc., that there was no support in the record for this figure. We deem it an approximation.

of The Latham Company, appellee, was also summoned by Mr. Ryan, and Ryan informed him that the matter should be adjusted "amicably." There was no meeting between Ryan and Brady. No solution was reached and suit was filed by Ryan on May 30, 1974. He had proceeded, however, with the construction of the swimming pool which was completed in early June, 1974, at a cost of $7,018.

At the trial, appellant's case was presented through his own testimony, that of Mr. Porter, the surveyor, and Frank S. Dudley, Jr., a qualified real estate appraiser. With respect to the misrepresentation of the western boundary, Mr. Ryan placed the northwest terminus at the point to which we have already referred and which is shown on the plat attached to this opinion. He also stated his understanding, obtained from Wilford, that the boundary line then ran southward in a straight line to a locust post at the southwest terminus.[5] Wilford emphatically denied that he ever represented to Ryan that the northwest corner of the property was located at the point claimed by Ryan. (The court in its findings concluded that Ryan's recollection of what Wilford told him concerning the location of the westerly line was not accurate and adopted Wilford's version.)

The real estate appraiser, Mr. Dudley, testified that the value of the .986 acres, based on Ryan's version of the misrepresentation, was $20,730 upon an average value of $21,034 per acre. In addition, he assessed a ten per cent loss factor because the .986 of an acre was "crucial to the privacy of the property," which amounted to $21,927. Mr. Dudley's estimated total damages were rounded to $42,500.

In his memorandum opinion the chancellor found, *inter alia:* (1) at no time did Mr. or Mrs. Brady make any representation to any person concerning the location or length of the boundary lines of the property or quantity of land contained within them; (2) that prior to the acquisition of the property, Ryan never discussed with anyone other than Wilford the boundary lines of the property; (3) Wilford

---

5. Actually, as the 1957 recorded plat disclosed, the southwestern section of the boundary line was not in a straight line but had a "dog leg" configuration.

freely admitted that he unintentionally, and through
mistake of fact, misrepresented the location of the
northwest marker and this misrepresentation was
"significant and material;" (4) as for a conflict in the
testimony of Wilford and Hawkins — the latter having
denied ever discussing the location of the westerly
boundary line with Wilford or anyone else prior to the
passage of title to Ryan — the court concluded that
Wilford's testimony concerning the extent of the
misrepresentation and his reliance upon Hawkins was more
credible; and (5) there was no evidence of fraudulent
misconduct on the part of any of the individuals involved.
"This is simply a case of negligent misrepresentation
originating with Hawkins and passed on to Ryan by Wilford,
who, we believe, under all the circumstances, had a right to
rely on it as being true and accurate."

Upon a careful review of the entire record we find that the
aforegoing conclusions are amply supported.

## II

As previously indicated, we also conclude that the
chancellor's findings that appellant was disentitled to the
relief of rescission, or, in the alternative, money damages,
was without error.

Rescission of a contract is the abrogation or unmaking of
the agreement and the placing of the parties to it in *statu
quo*. It is well established in Maryland that to be entitled to
this somewhat extraordinary relief there must be proof of
justifiable reliance on a material misrepresentation.
*Chesapeake Homes, Inc. v. McGrath*, 249 Md. 480, 488, 240
A. 2d 245, 249 (1968). Maryland law also recognizes that an
innocent misrepresentation may be sufficient to warrant
rescission. *The Glendale Corporation v. Crawford*, 207 Md.
148, 158, 114 A. 2d 33, 38 (1955); *Clark v. Kirsner*, 196 Md. 52,
56, 74 A. 2d 830, 832 (1950). With respect to contracts for the
purchase and sale of realty, it is clear that any
misdescription of the estate, interest or extent of the
property, in a material and substantial aspect, is sufficient
to avoid the contract, but the plaintiff must show that he

purchased the property *without knowledge* of the true state of the land, and that he suffered an injury or loss. *Chesapeake Homes, Inc., supra,* 249 Md. at 488, 240 A. 2d at 249. *The Glendale Corporation, supra,* 207 Md. at 158, 114 A. 2d at 38.

It is also fundamental law that the right to rescission is not unqualified. The right of the purchaser to rescind a contract for the sale of realty must be exercised promptly or within a reasonable time after the discovery of the facts upon which the right is invoked. *Wolin v. Zenith Homes, Inc.,* 219 Md. 242, 250, 146 A. 2d 197, 202 (1959). As the Supreme Court stated in *Grymes v. Sanders,* 93 U. S. 55, 62 (1876), "Delay and vacillation are fatal. . . ." The Court of Appeals quoted this statement in *Latrobe v. Dietrich,* 114 Md. 8, 21, 78 A. 983, 988 (1910), wherein the observation of Judge Alvey in the earlier case of *Foley v. Crow,* 37 Md. 51, 62 (1872) was also set forth:

> "It is well settled that applications for rescission must be made without delay, and that the party seeking to rescind must come to his election as soon as the cause for rescission is discovered, so that the parties to the contract may be placed as nearly in *statu quo* as possible. This requirement is founded upon an obvious principle of justice." 114 Md. at 21, 78 A. at 988.

The right to rescind such an agreement after discovery of the facts warranting the exercise of such right may be waived for failure to act within a reasonable time. As Judge Horney stated for the Court of Appeals in *Wolin,* the plaintiff is "put to a prompt election to rescind the contract or to ratify it and claim damages." (Citations omitted.) 219 Md. at 250, 146 A. 2d at 202. Again, once the election is made, it is forever determined. In *Telma v. Gingell,* 157 Md. 411, 146 A. 221 (1929), the Court declared:

> "The right which accrued to the grantee upon the discovery of the real facts was a right of choice or election only. This right when exercised is exhausted, and there is no *locus poenitentiae;* and,

consequently, if the grantee elects to affirm or to repudiate the conveyance, he can never after repudiate what he has once affirmed or affirm what he has previously disaffirmed." (Citations omitted.) 157 Md. at 415.

Or, as the Court expressed it in *Wolin, supra,* 219 Md. at 250-51, 146 A. 2d at 202: "Acts by a purchaser which constitute acquiescence, ratification or estoppel will preclude him from rescinding the contract."

Assuming for the moment that appellant Ryan had been in a position to invoke the right to rescission, it seems abundantly clear that he offended the rules by (a) failing to act promptly and (b) by performing acts constituting ratification rather than repudiation of the agreement. With respect to the time factor, it is manifest that a period of some seven to nine months elapsed between the date of the lawn mowing incident and the time of filing suit. As for Mr. Ryan's actions, the record discloses that he not only incurred some significant expense in replacement of the porch roof — no emergency being shown — but he also contracted in March 1974 for a $7,000 swimming pool, which, palpably, was not a necessary expenditure. As for the reason for the delay involved, Ryan himself could provide no satisfactory explanation. On cross-examination, he was asked by counsel for Brady what, if anything, he did with respect to ascertaining the accuracy of the plat exhibited to him by Mr. Berry after the lawn mowing incident. He responded:

"I did nothing at all. I of course desisted from mowing his lawn and I apologized for it. And felt that I did not care to get into a boundary dispute with Mr. Berry. I had just moved there, Mr. Berry himself was obviously not sure where his boundary was and when we moved in the Berrys couldn't have been more gracious to me and my children, and have been very good neighbors ever since that time.

I simply did not want to get into any contention

about a boundary line, most particularly since he, himself, was not positive of it."

The chancellor also inquired of the witness with respect to his inaction:

(The Court) "Well, now, you were put on notice back in the Summer . . . weren't you? That there was some problem with the boundary by Mr. Berry?

(The Witness) I just moved into the neighborhood, I didn't care to have any contention with Mr. Berry, as I think I testified sometime during this week. I probably would have known of this boundary error had I contracted to build the pool that Fall, when Mr. Griner had, whose name had been given to me, had been recommended by Jim Latham, for whom he had built a pool."

Finally, Mr. Ryan was pressed further by counsel for appellee Brady:

"Q. Well, I don't quite understand — or let me put it this way. I can understand why you would not want to get into any controversy with a new neighbor, that is certainly understandable, sir. But why, when Mr. Berry showed you this marker in your front yard and you must have assumed that it had some significance and gave you a plat, why didn't you call the Bradys, because they were no longer your neighbors?

A. I called no one. I wanted no controversy, as I recalled. *I was leaving for South Carolina for a vacation in August.*" (Emphasis added.)

There were, of course, other alternatives available to Mr. Ryan than controversy with his neighbor. The record clearly indicates that he was experienced in land transactions and that in this particular case he and his counsel were aware of the existence of the 1957 recorded plat. He did not communicate with counsel nor did he take prompt action to

obtain professional assistance in the verification of his boundary line. Obviously, he had knowledge of circumstances which ought to have put a person of prudence on inquiry. He could not reasonably fail to make inquiry when the propriety of the investigation was suggested by circumstances of which he was aware. *See Blondell v. Turover*, 195 Md. 251, 257, 72 A. 2d 697, 699 (1950). Furthermore, his actions in performing repairs and constructing a swimming pool represented an election on his part to stand by the terms of the agreement rather than to repudiate it. *See Wolin v. Zenith Homes, Inc., supra; Latrobe v. Dietrich, supra; Ortel v. Upper Ashburton Realty Co.*, 171 Md. 678, 190 A. 239 (1937).

There is yet another fundamental weakness in appellant's case which not only justifies the chancellor's finding that he was not entitled to damages, but also impinges upon his right to seek a rescission. We refer to the active role assumed in this case by appellant's counsel, at appellant's request, at a point in time antecedent to the execution of the contract. Asked whether Mr. Latham or Mr. Wilford offered to prepare a written agreement of sale after he had come to the decision to purchase the Brady property, Mr. Ryan responded:

> "I think Mr. Latham — not Mr. Latham — Mr. Wilford said something about preparing the contract of sale and I said I would have my attorney prepare the contract of sale."

Thereafter he explained under further questioning that he considered this "prudent" and was, at all events, his "usual practice."

As the evidence discloses, Attorney Hall undertook the drafting of the contract of sale, title examination and preparation of the deed. Preliminary to this work, three days prior to the execution of the sales agreement, he obtained from the clerk of the court a copy of Mr. Brady's deed. This deed referred to the recorded plat of the property and contained an incorrect reference to the land records in which the plat would be found. The agreement of sale, as

drafted by Hall, however, made an appropriate correction of the folio number. Based upon this fact, although Hall testified that he could not recall whether he had actually viewed the recorded plat prior to the execution of the contract, he thereafter conceded, "I think it's as obvious as could be what the answer to all that is . . . I think the answer is I saw it."

The recorded plat would have disclosed that the westerly boundary of the Brady property contained not one course but three courses, forming a "dog leg" at the southwest extremity, and that the line was not straight. The essential fault of Wilford's misrepresentation was that the western line was straight. The record plat clearly showed that this was erroneous. Mr. Ryan's counsel had either actual knowledge or was affected with notice of the true configuration of the "dog leg" appearance of the property line and, as shall be seen, this knowledge was imputed to Mr. Ryan so that the appellant knew, at the time he signed the agreement and accepted the deed to the property, that the westerly property line was not as had been represented by Wilford.

As for the knowledge of counsel, it is established law in Maryland that a title examiner is charged with notice of whatever appears in the land records in the chain of title to the property involved. *Williams v. Skyline Development Corp.*, 165 Md. 130, 165, 288 A. 2d 333, 373 (1972); *Williams v. Banks*, 11 Md. 198, 250 (1857). There is thus no room for a defense that Mr. Hall did not actually perceive the configuration of the western property line. If he did not, he was nonetheless affected with legal notice of it. Furthermore, notice to an attorney is notice to his client. *Williams v. Skyline Development Corp.*, *supra*, 265 Md. at 165, 288 A. 2d at 373; *Boring v. Jungers*, 222 Md. 458, 463, 160 A. 2d 780, 783 (1960). In *Boring*, the Court of Appeals affirmed a decree dismissing a bill in equity by purchasers to rescind a deed on the ground that the road frontage of a commercial lot was some 190 feet short of the 1200 feet which they believed they had purchased. The evidence showed that their attorney, Adolph Furman, was in

possession of a plat which showed the actual frontage. Hammond, J., later Chief Judge, wrote for the Court:

> "We think the Borings cannot justly complain because the road frontage, including that of the Peltzer wedge, was some 190 feet short of 1200 feet. Passing the point that the contract said the frontage was 'approx. 1200 feet' — compare *Cohen v. Numsen*, 104 Md. 676, 681, and *Brodsky v. Hull*, 196 Md. 509 — we find it clear that the Borings knew before settlement that there were only a little over 1000 feet of road frontage. *Furman was their agent; the evidence makes it plain that he knew the facts, and his knowledge acquired in the course of the transaction was the knowledge of his principals.*" (Emphasis added.) (Citations omitted) 222 Md. at 463, 160 A. 2d at 783.

And in an earlier case, *Gunby v. Sluter*, 44 Md. 237 (1876), the defendant successfully resisted a claim for rescission based on her alleged misrepresentations concerning the nature of her title by asserting that prior to execution of the contract the deed disclosing her true interest was supplied to the plaintiff, and was examined by plaintiff's counsel. The Court of Appeals stated:

> "A sale, though founded on the misrepresentations of the seller, cannot be for that cause wholly rescinded, if prior to the completion of the sale, the purchaser had become acquainted with the whole facts, and yet confirmed the bargain." 44 Md. at 248-49, *quoting* Hilliard on Vendors, § 330.

The logical extension of these principles and their legal effect is that although a purchaser of land has a right to rely upon a representation made to him by the seller or his agents, as to the boundaries, without being required to conduct an independent investigation of the land records, once the purchaser assumes the burden of an examination he cannot say that he was deceived to his injury where such examination discloses the correct information. *See Piper v. Jenkins*, 207 Md. 308, 113 A. 2d 919 (1955). As the Court of

Appeals declared in *Piper, citing Shappirio v. Goldberg*, 192 U. S. 232 (1904):

". . . where the means of knowledge are at hand, and the purchaser undertakes to make an examination of the land records, he cannot say that he was deceived and injured by misrepresentations of the vendor." 207 Md. at 314, 113 A. 2d at 922.

In *Shappirio*, upon which the chancellor relied in reaching his decision, a real estate broker was entrusted by the purchaser, Shappirio, with the examination of the deed and title. In the then Supreme Court of the District of Columbia, the purchaser's bill of complaint seeking rescission and alternative relief was dismissed, and the decree was affirmed by the Court of Appeals of the District of Columbia. In affirming that judgment, the Supreme Court, by Mr. Justice Day, held that the broker was the agent of Shappirio, "and his knowledge and means of information must be imputed to the purchaser." 192 U. S. at 241. The Court went on to say:

"When the means of knowledge are open and at hand or furnished to the purchaser or his agent and no effort is made to prevent the party from using them, *and especially where the purchaser undertakes examination for himself, he will not be heard to say that he has been deceived to his injury by the misrepresentations of the vendor.*" (Emphasis added.) 192 U. S. at 241-42.

Appellant seeks to avoid the result mandated by *Shappirio* by reliance upon *Chesapeake Homes v. McGrath*, 249 Md. 480, 240 A. 2d 245 (1968). In *McGrath*, the Court of Appeals granted the purchaser's bill for rescission in a situation where the vendor-defendant fraudulently represented the size of his lot. The opinion of Finan, J. held the case of *Piper v. Jenkins, supra,* to be of controlling effect. Although the purchaser was an attorney who had seen a plat of the subdivision on the wall of defendant's office, and who knew of the existence of the plat on file among the county's land records, the court held that the seller was estopped from

raising this defense since it had convinced the purchaser not to examine the plat because it was "small and somewhat confusing." 249 Md. at 489, 240 A. 2d 250. In the case *sub judice*, no effort was made on the part of the appellee to prevent the appellant from examining any of the land records or to distort the information disclosed therein.

As Judge Clark stated in his opinion below:

> "As the Court cannot conceive of a conscientious, title attorney (which we believe Mr. Hall to be) engaged in a transaction of this size and character, failing to read the recorded plat of subject property preparatory to drawing the contract of sale and deed and guaranteeing the title, we believe it to be reasonable to infer that he did so read it and accordingly draw this inference. The primary reason a title examiner must carefully examine the most recent plat of the property, the title to which he is searching, is to make sure that all deeds thereto subsequent to the date the plat was recorded embody the same description of the property as that shown on the plat. If they don't and nothing has been sold off or added to the property since it was surveyed and platted, then it would be necessary to obtain a confirmatory deed from one or more of the sellers' predecessors in title to reconcile the recorded deed descriptions of the property with its configuration as shown upon the recorded plat thereof and thereby remove that cloud upon the title. Furthermore, as a general rule, the most recently recorded plat is the best source for the description of the property."

The lower court was correct in finding that the knowledge of appellant's counsel as to the publicly recorded plat was imputed to Ryan himself. In legal effect, therefore, he completed the purchase of the Brady property with knowledge that the configuration of the westerly property line was different from what he had been told by Wilford. He cannot be heard to complain that he was deceived to his

injury by the mistaken representation of Wilford. The inevitable legal consequence is that the appellant purchased the Brady property at the price of $240,000 for the acreage actually contained within its boundaries, and is without a claim for damages against the Bradys and the several other appellees.

Even if a claim for damages could properly be entertained by the court, we agree with Judge Clark that no sufficient evidence was offered as to the quantum of damages sustained by appellant by virtue of the misrepresentation.

In this connection we observe, first, that the court rejected out of hand Mr. Ryan's claim that he had been deprived, by the misrepresentation, of some .986 acres; and we have previously noted that the court's conclusion that .4 of an acre was the actual extent of Ryan's loss, was the court's approximation only, and was not based upon expert testimony at the trial. Appellant's contention on this appeal must ultimately be reduced to this — that the mathematical computation employed by Ryan's appraiser, Dudley, to determine damages for the loss of .986 of an acre should have been employed by the court to determine damages for the loss of an uncertain quantity of land, perhaps not exceeding four tenths of an acre. In our judgment appellant would have the court indulge in the sheerest speculation by applying a questionable formula of valuation to an area of land of undetermined quantity. This we must reject.

*Decree and supplemental decree affirmed; costs to be paid by appellant, William A. K. Ryan.*