ALEXANDER C. G. MILKTON *v.* WILLIAM J. T.
FRENCH ET AL.

[No. 43, January Term, 1930.]

*Decided May 2nd, 1930.*

The cause was argued before Bond, C. J., Urner, Adkins, Offutt, Digges, Parke, and Sloan, JJ.

*J. Wallace Bryan,* for the appellant.

*Floyd J. Kintner,* for the appellee.

Parke, J., delivered the opinion of the Court.

The controversy on this appeal grows out of the sale on January 19th, 1926, by William J. T. French and Irene L. French, his wife, the defendants, to Alexander C. G. Milkton, plaintiff, of an improved lot of land in Baltimore City. The contract price was $8,000, and $300 was paid on the day of the sale, which entitled the plaintiff to immediate possession of the property. The residue of $7,700 was to be paid in weekly installments of $15, accounting from February 1st, 1926, and applied to the payment of taxes, water rent, and fire insurance, and then to the interest, and next on account of the purchase price, until such payments on the purchase money aggregated $1,000, when the defendants were to convey the property to the plaintiff by a good and marketable fee simple title, subject to a first mortgage of not more than $5,000, and a second mortgage for the residue of the debt, with a provision that the plaintiff continue said weekly pay-

ments of $15 to cover all interest and expenses, and the surplus to be applied on the principal. The amount secured by the second mortgage was to become due and payable three years after its date. The agreement provided that the plaintiff should be permitted to occupy the premises until default be made in the payment and continue for a period of four weeks, when the plaintiff agreed to surrender peacefully the premises; and that all payments on account of the purchase price and expenses should belong absolutely to the defendants, and be regarded as payments for the use and occupancy of the property, and as liquidated damages for its depreciation. It was further covenanted that, upon the determination of the plaintiff's right to occupy the premises, the defendants should be entitled to all the rights and remedies given by the local law of Baltimore City to landlords against tenants holding over. *Rogers v. Dorrance,* 140 Md. 419, 422. It should be noted that the contract, which was under seal, contained no covenant whatsoever with respect to the quality or condition of the premises sold.

Upon the signing of the contract of sale, the purchaser received a key to the bungalow, and found some visible minor defects, which the defendants, after delay, corrected about the middle of June, 1926, when the plaintiff moved into the house. He was married in July, and returned with his bride in August, and occupied the premises until March 9th, 1927, when he left. He paid the weekly installment of $15 from February 1st, 1926, until March 15th, 1927, when all payments stopped. After he had failed to pay for more than four weeks, the defendants re-entered, and, after doing some repainting and building a garage, sold the property, on July 1st, 1927, for $7,000. The defendants assert that they took possession according to the terms of the contract, after the plaintiff had defaulted in the weekly payments, and that they are entitled to retain the payments for the use and occupancy of the property and as liquidated damages for its depreciation, as is explicitly covenanted by the plaintiff. The plaintiff admits his abandonment of the premises and failure

to pay the weekly sum after March 15th, and justifies his acts upon the theory that it was his right to rescind the contract because of alleged fraudulent misrepresentations on the part of the defendants that induced him to purchase the property. The second amended bill of complaint prays specifically for the rescission and cancellation of the contract, an accounting to be had between the parties in respect to the several matters growing out of the contract; an injunction to prevent the defendants from asserting a forfeiture of the sums paid by the plaintiff, or from bringing any action to enforce the contract; and the awarding and enforcing a lien on the property to the extent of any sum which the court, on the accounting, may find to be due from the defendants to the plaintiff.

The alleged misrepresentations, which must be clearly established before the plaintiff will be entitled to relief, are either express or implied.

1. Taking up the testimony offered in support of the representations in the first division, it will appear that the defendants were developing and improving a parcel of land, and had placed their houses with a real estate agent for sale. The plaintiff was looking for a home and called on the agent, who took him and his betrothed to see the property. The party entered the house, which was of the bungalow type, and looked at the first and second floors and the basement, taking about ten minutes. While there the plaintiff asked the agent "how the construction was, whether it was substantial, any leaks in the basement, or anything like that and how the roof would be." He said, "perfect, cannot be any better, my boss works fine, does the best work can be done." In reply to a question about the condition of the basement with respect to moisture, the reply was: "Do not be afraid, a good floor. We sold all the rest of the houses and no complaint of any moisture or water or anything like that." Another inquiry brought the answer that the building was "perfectly well constructed." The present wife of the plaintiff said to the agent: "I want very much assurance on the basement and

the roof because I hear so many complaints here in Baltimore about the damp cellars and leaking roofs. I want to be perfectly sure." The agent responded: "Madam, be perfectly sure there is nothing the matter." The next day, at the plaintiff's request, the agent took the blank contract of sale to the plaintiff in order to let him examine it, but the plaintiff did not sign. He testified: "I said I want a little bit more assurance on this particular fact, well constructed. I want to be perfectly sure that the construction is right. He said, 'we will go down to the lawyer's office and have that fixed up right away.' "

The plaintiff and the agent went to the office of the attorney for the owners and submitted the request. The attorney was unwilling to incorporate the desired covenant in the prepared contract, but called French by telephone to inquire if he would be willing to put the proposed terms in the contract, and the agent informed him in the presence of the attorney that French refused to give any assurance of heating the house to 70 degrees, but the purchaser "was perfectly safe on the concrete, roof and everything else of the construction because" French "had built it himself." The plaintiff also testified that the attorney "wanted me to have a perfect assurance that it was fine and in perfect shape, and not put it in the contract, and we discussed about. I said: 'What do you want me to do, do you want me to accept your verbal assurance that everything is honest?' He said, 'You will never regret it,' and I said 'All right.' "

The real estate agent is dead, and the attorney, who also conducted the defense, did not testify. Plaintiff's testimony of what occurred between him and the agent at the first meeting is corroborated by the plaintiff's wife, who was present during that conversation. The defendant, William J. T. French, testified that the real estate man was the agent of the defendants for the sale of the property, and that the attorney had no authority to make any representations in reference to the property. This defendant further swore that he had been called by the attorney and asked if he would agree to the insertion of certain representations in the con-

tract of sale, and that he had declined. The attorney for the defendants, who was trying the case, did not testify to what he had said to plaintiff, and this leaves wholly uncontradicted the evidence of the plaintiff with respect to what the attorney advised him was the owner's statement by telephone. Under the circumstances, the defendants were bound by what the atttorney reported, as he was their agent for that purpose. In the absence of his testimony, the court cannot find the representations to have been other than the plaintiff testified. 2 *Mechem on Agency* (2nd Ed.), sec. 1987.

It is a fundamental condition for the right to rescind a contract on the ground of misrepresentation that the party aggrieved relied upon the misrepresentation, which must have been in respect of a material matter. Whatever may have been the scope of the real estate agent's authority in making the sale, the purchaser was not satisfied with the statements made by him, nor did he rely upon them in making the purchase. He demanded the blank contract of sale for his information and consideration. It was given him, and he informed the agent that the contract did not meet with his approval, as he wanted an assurance that the house was well constructed. At the agent's suggestion, the two went to the lawyer, who declined to incorporate the desired covenants, and called French to know if he would consent. According to French's testimony, he declined, and the plaintiff admits he was informed by the attorney, but asserts that the attorney stated to him that French had said over the telephone the purchaser "was perfectly safe on the concrete, roof and everything else of the construction because he built it himself." In the natural sequence of the transaction, it was then that the plaintiff said to the attorney: " 'What do you want me to do, do you want me to accept your verbal assurance that everything is honest?' He said, 'You will never regret it,' and I said, 'all right.' "

There is nothing in the ordinary relation of attorney and client which would induce the belief that the attorney would have any authority to make for his client representations as to the condition of the premises about to be sold. In fact,

the refusal of the attorney to incorporate the desired terms in the prepared contract and his request of the seller for authority negative any such inference. And the plaintiff testified that he was finally induced to sign by the attorney's reply, "You will never regret it," which, when taken in connection with the plaintiff's precedent question, was an expression of belief or opinion and not a representation. Even if it be granted that the action of the plaintiff was also motivated by the report made by the attorney that the purchaser "was perfectly safe on the concrete, roof and everything else of the construction, because he built it himself," nevertheless this did not amount to a misrepresentation.

In the first place, the use of the term "perfectly safe" in connection with every detail of construction was so extravagant in scope and measure, and so indefinite and elusive in meaning, that the statement would fall within the category of a puff instead of a representation, and the plaintiff, who was an architect of experience, could not have been misled or influenced. Nobody places trust in a representation based upon self-praise so general and comprehensive as to cover every detail of a subject matter, which common experience has established never attains that degree of perfection in all its numerous parts. The exaggeration of the statement is so plain that it can not be supposed to have deceived any rational person. Everybody knows a new house, as an old one, is never perfect in construction, but has the anticipated defects inherent to its period. *Bowers on Actionable Misrepresentation,* sec. 510; *Buschman & Cook v. Codd,* 52 Md. 202, 207; *Robertson v. Parks,* 76 Md. 118, 132, 133; *Byrd v. Rautman,* 85 Md. 414, 417; *Hall v. Brown,* 126 Md. 169, 173-174; *Reynolds v. Evans,* 123 Md. 365, 371, 372; *Sugden on Vendors* (8th Am. Ed.), 507 (335).

Again, if any statements induced the plaintiff to buy, they were made in the attorney's office immediately before the execution of the contract under seal. The only assertions there made are the vendor's message that the vendee would be "perfectly safe on the concrete, roof and everything else of the construction" because the vendor had built it him-

self, and the attorney's assurance given the buyer that the latter would never regret the purchase. It is difficult to find these words, when reasonably considered, as capable of being understood by a man of average intelligence as a clear and definite representation of any particular fact. The language does not condescend to detail. The words used are so vague and general as to be incapable of particular application. They fail, therefore, to mount to a misrepresentation, and are but the indefinite generalities of exaggeration. 1 *Bigelow on Fraud,* pp. 466-473.

Aside from some visible defects, which the plaintiff admits were corrected by the defendants, and a few complaints, which were obviously too trivial to be entertained, the quality or condition of the roof and concrete cellar floor constituted the substantial grievances growing out of the alleged express representations. If, therefore, the concrete and the roof be selected as the two identified subjects whose quality or condition was asserted, what is conveyed to a man of ordinary mentality by a representation that the buyer would be "perfectly safe" as to them? Words could not be more general and less certain in meaning. If, however, its vagueness be ignored and its natural effect as an opinion or prediction be disregarded, and the term "perfectly safe" be held arbitrarily to mean the assertion as a fact that the roof did not, and would not leak, and the concrete floor kept and would keep the cellar dry, there result two statements which must be false to constitute a misrepresentation. *Pomeroy's Eq. Juris.,* secs. 882, 884; *Pomeroy's Spec. Perf.* (3rd Ed.), sec. 214.

The house was completed in May, 1925, and from that time to the treaty of sale, which was a period of over six months, there is not a particle of evidence that the roof leaked or that the cellar was damp or was ever flooded with water. A few days before the sale, the purchaser had visited the premises and had seen the cellar and the rooms of the bungalow. There is no testimony from him that then the cellar was damp or that the roof leaked. The house had been built for half a year, and a damp cellar and a leaky roof are gen-

erally apparent to the sense. An architect would know where to look and what would be the evidence of these two conditions. So, it is but reasonable to conclude from the plaintiff's silence and the affirmative evidence on the part of the defendants, after the experience of half a year, it was a fact that the cellar was dry and the roof had not leaked.

It was not until some months after the plaintiff acquired possession that the defects complained of were observed. In June, 1926, the plaintiff first found the roof to leak and saw a small spot on the concrete floor, which he attributed to dampness. The roof was temporarily repaired, as is shown by a letter of the plaintiff, dated November 29th, 1926. It was not disclosed when the roof developed another leak under the stress of a driving rain against the front of the house, but, after the property was resold, this situation was cured by the defendants reroofing a part of the building. The damp spot in the concrete gave no concern to the plaintiff until November 16th, 1926, when water came through the concrete and flooded the cellar, as it did the cellar of the neighboring properties. The water was siphoned out, and all the dampness from this single invasion disappeared in eight days, and the plaintiff had no further trouble from this source until the first of March, 1927, when a small damp spot again appeared in the concrete floor. Since that time there has been no recurrence of flooding or dampness, as the testimony of the second purchaser and his wife establishes without contradiction.

Proceeding upon the present assumption that the vague and general statement made at the time the sale was concluded can be held to be a representation that the roof did not, and would not, leak, and that the concrete floor kept, and would keep, the cellar dry, the declaration was not a misrepresentation, since the quality or condition affirmed was not a false past or present fact, because it affirmatively appears that, since the house was built in May, 1925, until the making of the contract of sale, the roof had not leaked nor had the cellar been damp or flooded with water, and also, because no circumstances appear from the record which

would warrant the conclusion that the assumed representation of the prospective quality or condition of the roof or concrete cellar, that would prevent the entrance of water in the future, was made by the vendors either without believing at the time that it was true, or without any knowledge whatever on the subject and with no reasonable grounds to believe the statement was true. *Pomeroy's Eq. Juris.* (4th Ed.), sec. 884; *Scarlett v. Stein,* 40 Md. 512, 526; *Gunby v. Sluter,* 44 Md. 237, 247-248; *McShane v. Hazelhurst,* 50 Md. 107, 119; *Robertson v. Parks,* 76 Md. 118, 131-132; *Cahill v. Applegarth,* 98 Md. 493, 500-501; *Boulden v. Stilwell,* 100 Md. 543, 552; *Donnelly v. Baltimore Trust Co.,* 102 Md. 1, 13, 18; *Gale v. McCullough,* 118 Md. 287, 293; *Coan v. Consol. Gas, etc., Co.,* 126 Md. 506, 509; *Reynolds v. Evans,* 123 Md. 365, 372.

2.   In order to build in Baltimore City, the plans and specifications of the proposed structure must be filed with the building inspector, whose duty it is to see that they conform to the municipal regulations on the subject before a municipal permit to proceed with the construction is given.   It is not disputed that the builders fully complied with the law in this respect, that the permit was duly issued, and that the bungalow was built under official inspection and supervision, but departed in certain particulars from the original plans and specifications.   It is the plaintiff's contention that the act of filing these papers constituted a representation or warranty by the owners that the house would be erected in accordance with these plans and specifications, and that any departure from their terms constituted either a breach of warranty or a misrepresentation which would give the plaintiff a right to rescind his purchase.   The difficulty with this position is that there is nothing in the sealed contract incorporating either bodily or by reference any part of these plans and specifications, and, therefore, they are not to be read into the contract so as to supply the terms of an express warranty.   Nor does the record establish that there was any custom or collateral agreement from which it could be found that the vendors

were bound by an implied warranty that the building conformed in every respect to the original plans and specifications on file. *Balto. & O. R. Co. v. Stewart,* 79 Md. 487, 497, 498; *Stewart v. American Bridge Co.,* 108 Md. 200, 214, 215; 2 *Williston on Contracts,* sec. 926.

The plans and specifications, which were subject to permissible modification because of local conditions, were not seen nor their contents known to the plaintiff at any time before the execution of the contract of sale. Some time on the day of the making of the sale, the plaintiff asked the agent for a set of the plans and specifications of the building, and the agent, who did not have them, promised to obtain their blue print from the owners. It was about a week or ten days later that the agent furnished the plaintiff with copies of those filed with the building inspector in order to obtain the necessary permit for the construction of the house in question. The sale was, therefore, completed, and the plaintiff bound, before he knew anything of the requirements of these papers, and no verbal representation was ever made to him in reference to them. It follows that, not knowing anything about the plans and specifications, nor their requirements, and neither seeking nor obtaining any information of their provisions before buying, these documents could not have produced in the purchaser's mind an erroneous belief which influenced his decision to buy, and so were not a material inducement. Consequently, even if it be true that the building was not constructed in accordance with the original drawings and specifications, this fact would not be a ground for rescission. *Bower on Actionable Misrepresentation,* secs. 113, 114, p. 120, secs. 260, 202.

The plaintiff bought a new but finished house, about whose quality or condition the owners refused to give any warranty, but one of them stated that the purchaser would be perfectly safe on the concrete, roof, and everything else of the construction, because he had built it himself. It appears from the record that at the time of this statement the vendors knew nothing to the contrary, and that there is nothing omitted

from the statement which was then known to the vendors and whose omission made this statement false or misleading. So, the statement is free of fraud and is not a misrepresentation. *Brager v. Friedenwald,* 128 Md. 8, 32. As the vendors carefully protected themselves by declining to enter into a warranty of the quality or condition of the building, it would seem to have been quite obvious to the vendee that the vendors insisted and intended that he should buy at his own risk. If the plaintiff, under these circumstances, chose to contract without further inquiry, inspection, or warranty, he must accept the situation created by his own choice, since the vendors here did not nullify their express refusal to warrant by a clear, explicit, and direct fraudulent statement that the buildings were of a certain specific quality or condition. *Bower on Actionable Misrepresentation.* 209, 210, 1 *Bigelow on Fraud,* 473; *Bywater v. Richardson* (1834), 1 A. & E. 508; *Ward v. Hobbs* (1878), 4 App. Cas. 13, 20, 21; *Powers v. May,* 97 Mass. 180; *Jones v. Williams,* 24 Beav. 47; *Ramstead v. Allen,* 85 Md. 482, 486, 488.

The cases and authorities cited by the plaintiff have had careful consideration, but they are distinguished in principle or in their facts from the pending appeal, and do not support the right of the plaintiff to a recission of the contract under the circumstances shown by this record. As the reasons here stated are controlling, it will not be necessary to pass upon the other questions raised by the record.

*Decree affirmed, with costs to the appellees.*