ANNA M. ORTEL *v.* UPPER ASHBURTON REALTY
COMPANY, INCORPORATED, ET AL.

[No. 8, January Term, 1937.]

*Decided February 17th, 1937.*

The cause was argued before BOND, C. J., URNER,
OFFUTT, PARKE, SLOAN, MITCHELL, SHEHAN, and JOHN-
SON, JJ.

*H. Mortimer Kremer,* for the appellant.

*Joseph H. A. Rogan,* with whom was *J. Francis Ford* on the brief, for the appellees.

URNER, J., delivered the opinion of the Court.

The plaintiff, Anna M. Ortel, on December 15th, 1932, signed an agreement for the purchase, from the Upper Ashburton Realty Company, Inc., of thirty-eight or more lots included in the company's real estate development in the northwestern suburbs of Baltimore City. The purchase price was $8,000. Of that amount $3,200 was paid when the agreement was executed, and $150 the following day. It was stipulated that the balance should be paid at the rate of $50 per month beginning on April 15th, 1933. The sale was effected by a sales organization known as the Harrison-Broussard Company, a copartnership which had contracted with the Upper Ashburton Realty Company on August 16th, 1932, to serve as its exclusive sales agent for the disposition of its lots. The negotiations for the sale to the plaintiff were conducted principally by H. W. Philpot, the manager of the sales agency. Because of his alleged misrepresentations in procuring her agreement of purchase, the plaintiff refuses to make any further payments under its terms, and by this suit in equity she endeavors to have the contract rescinded and the vendor corporation and its three directors required to make restitution of the purchase money which she has already paid. The proceeding to that end, however, was not instituted until the lapse of nearly two years after the discovery of the fraud charged in the bill of complaint. According to its allegations the fraud consisted of the false promise, on behalf of the defendants, that the lots in which the plaintiff was thereby induced to invest would be resold for her within three months at a profit of at least $2,000, and that, in the event of a failure to make such a sale, the money paid by her on account of the purchase would be returned. It was further averred in the bill that the amount of

her payment on the purchase was derived from the sale of securities which she delivered to the defendants, or their agents, to be sold for the purposes of the investment; that subsequently they sent to her by messenger a contract for the purchase which she was persuaded to sign but was not allowed to read; that the promise of resale at a profit or repayment of the money received from the plaintiff has not been fulfilled, but the defendants have demanded of her additional payments to an amount largely in excess of her intended investment.

The defendants filed answers denying the allegations of fraud. A trial upon that issue resulted in a decree dismissing the bill, and the plaintiff has appealed.

The only witnesses who testified to material facts in the case were the plaintiff and J. Brooks Mellor, the vice president and sales manager of the Upper Ashburton Realty Company. The members and agents of the Harrison-Broussard firm, through which the lots had been sold to the plaintiff, were not available as witnesses. From the testimony of the plaintiff we quote as follows: "In November, or in the fall of 1932, I was repeatedly called on the telephone by the Harrison Company, who invited me to come to their development out to Ashburton Heights, and I told them I was not interested in real estate, but they persisted in calling, and finally sent a man to my home to take me out there to see their property, and thinking to be rid of him I went. * * * Before that, they had what they call a lecture luncheon system of selling real estate, and there was a speaker there who said during the course of his lecture that Messrs. Albrecht, Mellor and Hoch were the millionaire owners of that property, who were reputable persons of very high standing in the community, and were prepared to give clear title to any lots that were sold there. * * * A salesman of the company—Mr. Philpot—tried to interest me in the property there and I told him I was not interested as a building site. * * * Then when he saw he could not interest me in it as a home site, he wanted to know why I would not be interested as an investment,

and he went on to recite numerous cases of people who had bought property there, and in each case had sold at a profit. * * * Then to make it more attractive, he said the city had purchased adjoining property to be used as a public park, and when the general public realized that fact, there would be a great rush to buy these lots and if I would buy certain lots he pointed out on a map to me as an investment he would guarantee to sell them in ninety days at a profit that would make up all the losses that I would have assumed if I had sold the securities which I hold."

Yielding to that allurement, the plaintiff signed the contract of purchase which she now desires the court to annul. But, as she testified, "that was not the first one. There were three contracts involved altogether. The first two were for property that was located at Patterson Heights, which I had never seen or heard of before, and I was under the impression it was all at Ashburton Heights. That fact was called to my attention by Mr. Mellor. When I showed him my papers at the end of the ninety days, he pointed out to me the fact that they were not contracts with his company." The two prior contracts were executed on the 14th and 17th of November, 1932, and the vendor was the Arlington Realty Company, with which the defendants in this suit appear to have had no connection, but which was likewise represented by the Harrison-Broussard sales agency. On the occasion of each transaction the plaintiff delivered to Philpot some of her securities to be sold with a view to the application of the proceeds to the purchase price. The payments thus provided for aggregated $8,450, and absorbed all but $540 of the amounts realized from the sale of the plaintiff's securities. It was her belief, according to her testimony, that the payments under the three contracts were exclusively for Upper Ashburton lots and fully satisfied her liability as purchaser. In regard to the number of lots she was buying, or as to the valuation per lot, she disclaims any definite understanding. After signing the contracts, partly in blank, at the office of

the sales agency, she received them by mail or messenger in their completed form as executed by the vendor corporation, but without reading the agreements she placed them in her safe deposit box, from which they were not removed for several months. The lots not having then been resold, she visited Philpot with a view to having that purpose accomplished. Any effort which he may have made to sell the lots for the plaintiff was unsuccessful. The sales organization which employed him ceased to function and he removed from Baltimore.

The testimony of Mr. Mellor was to the effect that, when the plaintiff called to see him in the spring of 1933, she complained that two of the three contracts she had signed at Philpot's solicitation were for the purchase of lots of the Arlington Realty Company at Patterson Heights, whereas she had understood all of the contracts to have relation to lots of the Upper Ashburton Realty Company at Ashburton Heights; that the plaintiff in her interviews with him never claimed to have bought the lots upon the assurance of a resale for her at a profit; but that she asked for an extension of time, which he agreed to grant, for the monthly payments required by the contract with his company. It was stated by the plaintiff in her testimony that she asked Mr. Mellor to make an effort to sell the lots, and there was produced in evidence her letter to him, under date of July 15th, 1933, in which, after referring to a friend who had money for investment, she said: "Feel certain this man could be sold at least a part of lots I hold at Ashburton Heights and would like to talk to you further regarding this man at your convenience." Inclosed with that letter the plaintiff sent to Mr. Mellor a copy of one, of the same date, which she had mailed to Philpot at Washington, D. C., and which is here quoted as follows: "This is a demand for you to come to Baltimore within the next few days and explain to the owners of both Ashburton and Patterson Heights in my presence just why you took me to Ashburton and showed me a map of that development and sold me property at Patterson Heights, a place which

today I have never seen before and have been unable to locate. If you fail to comply with this request, I will immediately take every means of securing your presence here." No response from Philpot appears to have been received by the plaintiff, and a resale of the lots was not effected.

The pending suit was brought on March 23rd, 1935. A similar suit against the Arlington Realty Company was settled by the transfer to the plaintiff of certain lots, equal in number to those for which she had originally contracted with that company.

The sales agent's promise to the plaintiff that he would resell the lots for her benefit would not be an adequate ground for the rescission here proposed unless the promise was made without any intention by the agent that it should be performed. According to *A. L. I. Inst., Restatement of Law of Contracts,* sec 473: "A contractual promise made with the undisclosed intention of not performing it is fraud." In *Councill v. Sun Ins. Office,* 146 Md. 137, 150, 126 A. 229, 234, it was said, in the opinion by Judge Offutt, after reference to the permissible inference from the testimony that the defendant's promise, there in question, was never intended to be fulfilled: "Whether under such circumstances that promise amounted to a fraud is a question upon which there is much confusion and conflict in the authorities, but, in our opinion, reason and justice, as well as the trend of the best-considered cases, support the proposition that a false promise, not intended to be performed, but made to trick and deceive another into the execution of a written instrument, is a fraud, and may in any action on the instrument be shown by any competent evidence, whether oral or documentary." The opinion in that case quoted from *Williston on Contracts,* par. 1496, as follows: "It is frequently said that a promissory statement cannot be the basis of an action for deceit, and a prediction of future events is at best a statement of opinion. It is undoubtedly true that failure to perform a promise cannot amount to fraud. And in many jurisdictions, with-

out consideration of the question whether a promise was made with an intention not to perform it, it is held that the making of the promise cannot be an actionable fraud. It has been pointed out, however, that when a promise is made with intention not to perform it, the promisor is guilty of misrepresentation. And in a number of cases, generally of recent date, the doctrine seems broadly accepted that a promise which the promisor does not intend to carry out may be a misstatement of material fact." In the discussion of the present case we are assuming, for the purposes of the decision, that the absence of a real intention by the sales agent to perform his promise to the plaintiff could be inferred from the evidence.

There is no support in the plaintiff's testimony for the allegation in the bill of complaint that she was not allowed to read the contract involved in this litigation. Accepting her statement that she did not in fact read it before its execution, there was ample opportunity for her to note the terms of the agreement when it was sent to her after it had been signed by Mr. Mellor for the vendor corporation. It included the stipulation: "No statement shall be binding upon the Upper Ashburton Realty Company unless in writing." That provision was intended to protect the vendor company against such a verbal undertaking by its agent as the promise to which the plaintiff has testified. But such a clause did not prevent the plaintiff from repudiating the contract if her execution of it was fraudulently induced. *Standard Motor Co. v. Peltzer*, 147 Md. 509, 128 A. 451; *Steed v. Upper Ashburton Realty Co.*, 170 Md. 288, 184 A. 230.

While the plaintiff appears to have been influenced to enter into the agreement of December 15th, 1932, by the sales agent's assurance of an early resale for her at a large profit, we are not convinced that she then believed the purchase price for the lots listed in the contract to be limited to the amount paid when it was signed. Her understanding that it provided for further payments is proved by the statement in her testimony: "I was assured there would never be anything more payable on that

property because of the fact that I had taken care of any payments that would arise over a period of ninety days, at the termination of which time the property would be sold." It was from the payments thereafter accruing under the contract that the plaintiff was to be exempted by the promised resale of the lots at a higher price. The fact that $150 to pay installments for three months was collected is consistent with the plaintiff's statement as to there having been a promise to resell within that period. On the other hand, her omission to mention it in her letter to Philpot suggests a doubt as to how far she relied upon his professed ability and intention to accomplish, within so short a time, a profitable resale of the large number of lots which she agreed to purchase. But whatever question there may be as to the plaintiff's failure to appreciate the liability imposed by the contract, it is certain that she delayed for a long time its ultimate repudiation. It is true that she made no further payments on account of the purchase price, but she recognized the existence of the contract by her requests of the defendant corporation, and by her own efforts, to have the lots resold. In her letter to Mr. Mellor she referred to a probable purchaser of "at least part of the lots I hold at Ashburton Heights." That letter was written three months after the expiration of the period within which Philpot's promise of resale was to have been performed, and long after the plaintiff admittedly had read the contract and understood its terms. The evidence does not indicate that any demand for its rescission was made by the plaintiff prior to the institution of this suit, about two years after she learned of the fraud charged in the bill of complaint. It was because of the plaintiff's subsequent recognition of the contract, and her delay in repudiating its provisions, that the chancellor denied her claim to relief in equity.

In *Telma v. Gingell*, 157 Md. 411, 146 A. 221, the plaintiff was induced to buy an improved lot of land by a fraudulent misrepresentation as to the duration of an unrecorded lease of a tenant corporation by which part of the property was then occupied. This was held to be

"a material representation of an existing fact which was peculiarly within the knowledge of the vendor, and therefore was one upon which the plaintiff had the right to rely." It was further said in the opinion of this court as delivered by Judge Parke: "Upon the discovery by the vendee of the fraudulent misrepresentation, the purchaser had to elect between two rights. He was put to the choice of repudiating or ratifying the conveyance, although the transaction had been fully completed by conveyance and payment. If he adopted the first alternative, he repudiated the conveyance and sought its rescission and a restoration of his situation before the contract; but if he chose the second, he ratified the grant but could obtain damages to redress the injury inflicted by the false and fraudulent representation. These rights were inconsistent and mutually exclusive, and the discovery put the purchaser to a prompt election. *Williston on Contracts,* secs. 1528-1531; *Shappirio v. Goldberg,* 192 U. S. 232, 242, 243, 24 S. Ct. 259, 48 L. Ed. 419; *Brager v. Friedenwald,* 128 Md. 8, 34, 97 A. 515; *York Mfg. Co. v. Hoblitzell Nat. Bank,* 118 Md. 505, 512, 84 A. 559; *Latrobe v. Dietrich,* 114 Md. 8, 21, 78 A. 983; *Bierce v. Hutchins,* 205 U. S. 340, 27 S. Ct. 524, 51 L. Ed. 828." In that case the plaintiff's claim for equitable relief was refused because of his acts of ownership with respect to the property after his discovery of the fraud by which his purchase was procured. The opinion said: "The acts were deliberately done and had but one significance, and, so, without reference to the vendee's actual intention to choose, an election resulted which was final. The law does not permit a mental reservation to qualify unequivocal acts, which imply a final choice and affirmation."

There is no sufficient reason to except this case from the application of the principle which governed the decision of the case just cited. The evidence leaves no room for doubt as to the plaintiff's ability, in point of intelligence and business experience, to determine, without unreasonable delay, whether to repudiate the contract negotiated with her by the defendant corporation's agent,

or to accept its provisions and avail herself of any legal remedies or defenses to which she may be entitled because of the alleged fraud. The course which the plaintiff actually pursued was in effect equivalent to a rejection of the first of those alternatives, and we are consequently unable to hold that she has now a right to maintain this suit to have the contract rescinded.

*Decree affirmed, with costs.*