FOWLER ET UX. *v.* BENTON ET AL.

[No. 25, September Term, 1962.]

572

*Decided November 5, 1962.*

*Motion for rehearing filed December 3, 1962, denied December 12, 1962.*

The cause was argued before BRUNE, C. J., and HENDERSON, HAMMOND, PRESCOTT, HORNEY and SYBERT, JJ.

*Mrs. Flora D. Fowler,* in proper person, with whom was *Kenneth Leo Fowler* on the brief, for appellant.

*Francis X. Jahn,* with whom were *Cary M. Euwer* and *Mitchell, Clagett & Euwer* on the brief, for M. Leo Storch, part of appellees.

*Carlyle J. Lancaster* and *Henry E. Weil,* with whom were *Welsh & Lancaster* and *Nylen, Gilmore & Simpson* on the brief, for C. P. Benton and Thomas F. Halley, other appellees.

PRESCOTT, J., delivered the opinion of the Court.

After the trial judge, in the Circuit Court for Prince George's County, directed verdicts in favor of the defendants, a real estate developer, a builder and a real estate broker, as to the third count of their declaration which alleged fraud and deceit, the plaintiffs, purchasers of a house and lot, appealed.

The only questions presented for decision are rulings on the admissibility of evidence, and the propriety of granting the motions for directed verdicts.

The appellee Storch had developed a subdivision known as Seabrook Acres, and during October of 1955 he sold certain lots therein to the appellee Benton. Thereafter, Benton built a house and constructed a septic tank system on one of these, which said lot and the improvements thereon was purchased by the plaintiffs from Benton in February of 1957. The permit for the septic tank system obtained by Benton called for a 500 gallon tank, the system to serve a five-room one-bath dwelling with three residents. The contract between the plaintiffs and Benton called for certain alterations to be made by Benton on the second floor, which, when completed, made the house consist of five bedrooms, two baths, living room, dining room and kitchen. The plaintiffs, at the time of the execution of the contract, had nine children, and they offered evidence to the effect that Benton knew of this number before he signed the contract, a fact denied by him. Benton conceded that the sewage disposal system was constructed according to the original permit issued to him, and that he had neither applied for, nor obtained, a remodeling permit.

The contract of sale was procured for Benton by the ap-

pellee Halley, acting through his salesman, one Frank Garber. There was testimony to the effect that the plaintiffs, realizing they had a large family, specifically talked with Benton and Garber concerning the sanitary system. Upon being questioned Benton and Garber made almost identical statements. When asked if plaintiffs "could trust—if [they] could rely upon the system which had been installed" in their prospective new home, Mrs. Fowler testified that Benton (and later Garber in practically identical terms) said that "there wasn't any reason in the world why [the plaintiffs] couldn't feel that it was adequate because it had been put in according to Health Department regulations and that it had been approved by the County Health Department." It is not denied that the system was constructed according to the permit issued to Benton and it was approved by the Health Department apparently before the additional rooms were added by alterations. Mrs. Fowler testified that the plaintiffs would not have purchased the dwelling had it not been for the representations made to them by Benton and Garber that the sanitary system was adequate.

Soon after occupancy by plaintiffs, difficulty developed with the septic tank system that Benton had installed. The effluent therefrom began seeping out of the ground. Upon complaint by plaintiffs, Benton had his plumber install an overlead pipe, which prevented the "wash water" from going into the drain field and emptied it close to an open ditch by the roadway. Considerable additional difficulty was experienced by the plaintiffs. The Washington Suburban Sanitary Commission made a sewer line available some eight or nine months after the plaintiffs had moved in, and the plaintiffs were directed to connect therewith.

*Rulings on the admissibility of evidence.*

We will first deal with these rulings as they materially affect the question as to whether the motions for directed verdicts should have been granted. A certain Elbert W. Tall was offered by the plaintiffs for the purported purpose of showing a general non-adaptability of the soil in Seabrook Acres for septic tank use, a fact that the plaintiffs' claim "should have been in the knowledge" of Benton and Halley. The witness stated he had purchased a lot in the subdivision in 1953, and "upon moving

in [had] heard various comments about septic tank operations in the area." After objection, a long colloquy between the court and counsel followed at the bench. Some of this lengthy colloquy referred to what counsel for the plaintiffs thought they could prove by the witness; some of it referred to possible rulings by the court; and some of it referred to what counsel for the defendants considered to be the law. However, no ruling was made by the court on any specific testimony offered, nor was there any formal proffer of proof made by the plaintiffs. This is a most unsatisfactory mode of attempting to reserve questions for appellate review. It often requires a careful study of many pages of the record extract, which the study reveals to have little, if any, bearing upon the issues to be decided. And in the absence of some ruling by the court, there is nothing for the Court of Appeals to review. *State Roads Comm'n v. Berry,* 208 Md. 461, 118 A. 2d 649.

Maryland Rule 522 a and b does not require a formal exception to a ruling of the court, but states that it is sufficient if a party "makes known to the court the action which he desires the court to take * * *." A simple and effective manner of preserving for appellate review the correctness of the trial court's rulings when failing to admit offered testimony is for counsel to ask specific questions of a witness, and obtain a ruling by the court on each question[1] (as a matter of practical procedure, if the court deems it desirable certain of the questions may be dictated to the court stenographer at the bench beyond the hearing of the jury) ; and, if the question itself does not disclose its relevancy, then counsel should call to the court's attention the nature of its materiality. Another easy and also effective method of obtaining appellate review not only of the immediate question asked but also those of a similar nature is, after an objection has been sustained to a question asked, to make a formal proffer of what the witness' testimony would be in answer to the question asked and those of a similar nature, place the proffer in the record, and obtain a ruling by the court on its admissibility.[2]

---

1. Cf. State Roads Comm'n v. Bare, 220 Md. 91, 151 A. 2d 154.

2. This latter course is particularly desirable if counsel desire to ask the "same" question in several different ways, and there is

The court finally concluded the above mentioned colloquy by directing counsel to ask the question again and he would rule on it as "we go along." He stated, "We [the court] have to rule on each question as it is asked." The witness stated, in substance, that he had purchased a home in the subdivision in 1953 and thereafter had "heard various comments about septic tank operations in the area"; that in December, 1953, "some of the residents of the area were holding a meeting to discuss the problem of septic tank operations in several of the back yards in this particular section of the subdivision"; and that in 1954 and 1955 he held a real estate "license through his [Benton's] realtors agency." Objections (they should have been motions to strike) were made and sustained. No further questions were asked as to what the "various comments" were, or what the object of the meeting "to discuss the problem of septic tank operations" was, or that the defendants had knowledge of either, nor was any proffer made to aid in showing the relevancy of any of this testimony. Obviously, such testimony, standing alone, was too remote to have any probative value.

The same procedure was followed when Fred C. Hasselbring, loan guaranty officer of the V.A., was called as a witness, *i.e.*, after objection was made to a question asked, a colloquy followed at the bench and the court again directed counsel to ask questions, stating he would rule on their admissibility as they were asked. Thereafter, the court sustained objections to questions that inquired if the witness had, in 1954, "ever inspected or had any other dealings with that area [Seabrook Acres]"; if V.A. finance loans had ever been made on homes in that area; and if in 1954 he had seen the condition "of the septic tank systems in the Seabrook Acres area." It was conceded that the witness had not "inspected" the plaintiffs' lot, and no proffer was made to show any knowledge on the part of Benton or Halley of the witness' activities, or that of the V.A. Under these circumstances, the testimony attempted to be elicited by these questions was, we think, too remote.

In addition, Mrs. Fowler, who had assumed the direction of

a possibility of creating prejudice in the minds of the jury, if the testimony is ultimately determined to be inadmissible.

plaintiffs' case, destroyed any value that this testimony of these witnesses would have had, if it had been admitted. The testimony was offered in an attempt to show that the soil in Seabrook Acres, generally, was not satisfactory for the proper functioning of septic tanks. However, Mrs. Fowler called Harry C. Naylor, a County Health Department Inspector, who testified in response to questions propounded by her that he had personally made a percolation test (describing the same) on plaintiffs' lot before a permit was issued to Benton for the septic tank system. He further stated that the test was satisfactory, and, had it not been, no permit would have been issued. Plaintiffs' counsel had conceded that the adaptability of property for septic tank use depends on many factors, such as elevation, run-off and sandy, loamy or clay soil. (This is a fact that is very generally known.) In other words, a lot that is satisfactory for septic tank use may be located quite close to those that are not. Thus, we have the anomalous situation of plaintiffs, who complain that the defendants made a false representation to them to the effect that the soil on the lot purchased by them was fit for septic tank purposes when it was not, proving affirmatively that the soil was satisfactory for such purposes.

The remaining questions on the admissibility of evidence are not difficult to determine. (1) The Health Department served a written notice on the plaintiffs to connect with the Sanitary Commission line within thirty days. Plaintiffs offered this notice in evidence, but the court refused to admit it. There was no prejudice here; because, if we assume, without deciding, the notice was admissible, there was other testimony admitted, without objection, that showed that water from the septic tank was running across the yard, and plaintiffs had been directed to hook-up with the Sanitary Commission. (2) The same ruling will apply to (2). Benton received a letter from Chris Sondberg, Chief Building Inspector, with reference to certain alleged defects in plaintiffs' building. The reference to the septic tank stated: "* * * the lead off drain leading to the street is not acceptable. Adequate dry wells should remedy this condition." The witness Sondberg was permitted to testify without objection to the lead off drain to the street not being acceptable (in fact it was in violation of regulations), and that dry

wells should remedy the condition of the system; therefore, even if the letter were admissible, its exclusion was harmless error. (3) The appellants offered the purported minutes of several meetings of a civic group at which various septic tank problems were discussed. Appellants apparently admit, as indeed they must, that these documents were not offered through any witness who could authenticate them; therefore they were properly rejected. *Handy v. State,* 7 H. & J. 34; 32 C.J.S., *Evidence,* § 701. Cf. *Haney v. Marshall,* 9 Md. 193; *De Riesthal v. Walton,* 66 Md. 470, 8 A. 462; *Schroder v. State,* 206 Md. 261, 111 A. 2d 587. (4) Plaintiffs attempted to introduce a letter or memorandum from a Dr. Reilly of the Health Department to a Dr. Englar, but the court ruled it out. There is nothing for us to pass upon in this respect: the letter is not in the record extract, Maryland Rule 828 b, and there is nothing therein, nor in the briefs, to disclose its contents. Obviously, it is impossible to pass upon the admissibility of a document with no knowledge of what it contains.

### Rulings on the Motions for Directed Verdicts.

Judge Miller, in the early case of *McAleer v. Horsey,* 35 Md. 439, the lodestar of all subsequent actions of deceit in Maryland, pointed out that the common law furnished, perhaps wisely, no definition of fraud. Judge Pattison, for the Court, in *Schnader v. Brooks,* 150 Md. 52, 132 A. 381, stated that the decisional law of this State had established principles which were controlling in that case of deceit. He then set forth the essentials of actionable fraud. In *Babb v. Bolyard,* 194 Md. 603, 72 A. 2d 13, Judge Markell repeated that the decisions of this Court had established rules and precedents which govern actions of deceit, and he again stated, with some elaboration, the elements of actionable fraud.[3] We shall, therefore, not set them out in detail; briefly stated, they consist of representation of a material fact, falsity, scienter, deception and injury.

The authorities seem to be uniformly in accord that in an action for fraud the alleged misrepresentation must, generally, be of a past or existing fact. *Boulden v. Stilwell,* 100 Md. 543,

---

3. See also Schmidt v. Millhauser, 212 Md. 585, 130 A. 2d 572; Fegeas v. Sherrill, 218 Md. 472, 147 A. 2d 223.

60 A. 609; *Schnader v. Brooks, supra;* 37 C.J.S., *Fraud,* § 6. In its generic sense, a false representation is anything short of a warranty which produces upon the mind a false impression conducive to action. 37 C.J.S., *Fraud,* § 8. Ordinarily, however, the representation must be definite, and mere vague, general, or indefinite statements are insufficient, because they should, as a general rule, put the hearer upon inquiry, and there is no right to rely upon such statements. *Robertson v. Parks,* 76 Md. 118, 24 A. 411; 37 C.J.S., *Fraud,* § 8. Whether the statements, acts, or conduct of a person amount to a misrepresentation of a past or existing fact is ofttimes difficult of determination, and the courts have been reluctant to attempt to lay down any general hard and fast rule as to what constitutes a fraudulent representation, since this depends upon the particular circumstances and conditions in each individual case.

However, the cases, rather uniformly, hold that representations as to the quality or condition of property are not actionable where they are mere expressions of opinion, *Johnson v. Maryland Trust Co.,* 176 Md. 557, 6 A. 2d 383, or where the parties have equal means of knowledge so that there is no right to rely upon the statements as to the quality or condition of the property. 37 C.J.S., *Fraud,* § 53c. But representations as to quality and condition may constitute fraud where they are asserted as statements of fact. 37 C.J.S., *Fraud,* § 53c. See also *Pryor v. Foster,* 130 N. Y. 171, 29 N. E. 123 (Heating capacity of a furnace) ; and *Clogston v. Martin,* 182 Mass. 469, 472, 65 N. E. 839, wherein the Court stated: "We cannot say that the actual condition of the plumbing with its sewer connections * * * cannot be known so that within a reasonable and legal sense a representation of such condition may be made as of one's own personal knowledge." And representations as to quality or condition may amount to fraud where the speaker, by his statements, prevents the hearer from investigating the condition of realty, *Henderson v. Henshall,* 54 Fed. 320 (C. A., 9th), or personalty, *Buschman v. Codd,* 52 Md. 202; or where the facts are peculiarly within the knowledge of the speaker and difficult for the hearer to ascertain, as where the misrepresentations relate to latent defects. 37 C.J.S., *Fraud,* §

53c; *Cook v. Gill,* 83 Md. 177, 34 A. 248; *Buschman v. Codd, supra.* The cases from other jurisdictions are collected in 37 C.J.S., *Fraud,* § 34a, n. 78.

Having in mind the above principles of law, and assuming, as we must, the truth of plaintiffs' evidence, with the most favorable permissible inferences, we proceed to consider, separately, the directed verdicts in favor of the defendants. In doing so, we do not decide any question as to the truth or falsity of the testimony, nor do we intimate any opinion of ours as to the credibility of the witnesses. These are functions of the jury; our duty is merely to determine whether there was any legally sufficient evidence against any of the defendants to take the case to the jury.

Plaintiffs' claim of the falsity of Benton's statement to them concerning the adequacy of the sewage disposal system has a double thrust. First, they set out, and attempted, to prove that the soil of their lot was not suitable for septic tank use, a fact known, or "that should have been known," by Benton. It would serve no useful purpose to discuss this contention at length, for, as we pointed out above, the plaintiffs ended up by proving that the soil was adaptable for that purpose. We hold that the plaintiffs offered no legally sufficient evidence to take the case to the jury on this issue.

The other thrust is a claim that they were entitled to go to the jury on the theory that Benton's statement was false, because they had offered evidence to show that he knew the size of plaintiffs' family and also the size of the septic tank system, which was palpably too small for their family. Upon analysis of the evidence, we think the claim has substance. It was conceded that he knew that the soil in Seabrook Acres consisted predominantly of clay—a soil that can be adapted to septic tank use, but with more difficulty than others of a more porous nature; that he obtained a permit for the installation of a small unit to accommodate a small family, as described above; that he agreed in the contract of sale to alter the interior of the dwelling; that it finally consisted of eight rooms and two baths; and that he did not request, nor obtain, a remodeling permit, in order to increase the capacity of the sanitary system. And Mrs. Fowler testified that, when asked if the plaintiffs could

rely on the system, Benton replied: "* * * there wasn't any reason in the world why we couldn't feel that it was *adequate* [italics ours] because it had been put in according to Health Department regulations" and had been approved by the Health Department. Mr. Fowler testified, in substance, to a like statement made by Benton to him. It is obvious that the actual size of the system (it being under ground) was peculiarly within Benton's knowledge, and very difficult for the buyers to ascertain. This assertion by Benton was not a vague, indefinite, general statement incapable of particular application, such as the buyer "could not go wrong"[4] if he purchased a house, or that the purchaser "would be perfectly safe on the concrete, roof, and everything else of construction."[5] it referred specifically to the septic tank system actually installed by Benton, and was tantamount to an assertion that he, a man of many years' experience as a builder, knew of no reason why the plaintiffs would not find the system "adequate," and one of the reasons why they should find it adequate was that it had been approved by the Health Department. As a matter of fact, the only approval given by the Health Department with reference to adequacy was for a five-room one-bath dwelling for three residents, and Benton knew this. And there was testimony, as pointed out above, that Benton had substantially enlarged the house, and he knew that plaintiffs' family consisted of eleven people. Therefore, if the jury believe the above testimony of the Fowlers, or either of them, the jury would be entitled to find (if they so determine) that Benton's statement was a misrepresentation of fact, and that Benton, a builder of 35 years' experience, knew it was false. True the system had been erected according to the permit and had been approved by the Health Department, but (repeating) it had not been approved with regard to adequacy and capacity for a family of eleven. What this Court said in *Brager v. Friedenwald,* 128 Md. 8, 32, 97 A. 515, is particularly apposite here: "Where one is under no legal obligation to speak, his mere silence or his mere non-disclosure of material facts will not be sufficient [see also *Fegeas*

---

4. Fegeas v. Sherrill, supra and infra.
5. Milkton v. French, infra.

*v. Sherrill, supra,* 218 Md. 472, 147 A. 2d 223], but if in addition to non-disclosure he makes 'some active mis-statements of fact, or, at all events, such a partial and fragmentary statement of fact,' as entirely misleads one to his injury the legal situation is entirely changed: * * *." An early English case, *Foster v. Charles,* 19 E.C.L. 113, expresses the same principle in this manner: "If a man, professing to answer a question, select those facts only which are likely to give a credit to the person of whom he speaks, and keeps back the rest, he is a more artful knave than he who tells a direct falsehood." The Supreme Judicial Court of Massachusetts, in *Van Houten v. Morse,* 38 N.E. 705, states the principle thus: "But a partial and fragmentary disclosure, accompanied by the wilful concealment of material and qualifying facts, would be as much of a fraud as actual misrepresentation, and would be in effect misrepresentation." Hence, if we assume that Benton could have remained silent with reference to the adequacy of the system installed without being guilty of any fraud, the jury, should they believe the Fowlers' version of Benton's statement, would be entitled to find that the statement was of such a partial and fragmentary nature as to prevent further investigation by the Fowlers, and to mislead them to their injury.

The case at bar is distinguishable from such cases as *Milkton v. French,* 159 Md. 126, 150 A. 28, and *Fegeas v. Sherrill, supra.* In the *French* case, the plaintiff prayed for the rescission of a contract of sale. He had purchased a new but finished house, about whose quality or condition the sellers specifically refused (although they were requested) to give any warranty. He claimed that one of the sellers stated that he [the buyer] "would be *perfectly safe* [italics ours] on the concrete, roof, and everything else of the construction, because [the speaker, one of the sellers] had built it himself," and this amounted to a false representation entitling him to rescind the contract. The Court held that the words used were so vague and general that they were incapable of particular application, and, therefore, did not amount to a misrepresentation, but were "indefinite generalities of exaggeration." Further, the Court said that at the time of the statement "the vendors knew nothing to the contrary, and there is *nothing omitted* from the statement [italics supplied] which was then known to the vendors and

whose omission made this statement false or misleading," and held that the statement was, therefore, free of fraud and not a misrepresentation. In the case at bar, Benton's alleged statements to the Fowlers omitted any mention of the size or capacity of the septic tank system that he had actually installed. In *Fegeas,* another rescission case, we held a statement by one of the sellers that the purchasers "could not go wrong" in buying a certain house was not a clear and definite representation of any particular fact, did not condescend to detail, and amounted to no more than an indefinite generality of exaggeration. See also *Appel v. Hupfield,* 198 Md. 374, 84 A. 2d 94, and *Polson v. Martin,* 228 Md. 343, 180 A. 2d 295 in which alleged statements were held not to be false representations of facts.

Although Benton does not urgently press the point, he mentions, in his brief, that the contract involved herein contained an integration, or merger, clause. We do not find it necessary to discuss the point elaborately. In the first place, there was no objection to the testimony of Mr. and Mrs. Fowler as to the statements made to them by Benton with reference to the adequacy of the sanitary system. And where fraud is alleged to have caused the execution of a written contract, a merger clause therein is not conclusive. 5 *Williston, Contracts,* (Third Ed., Jaeger), § 811; *Restatement, Contracts,* § 238. Cf. *Schmidt v. Milhauser,* 212 Md. 585, 130 A. 2d 572; *Rinaudo v. Bloom,* 209 Md. 1, 120 A. 2d 184.

Having decided that the plaintiffs offered sufficient evidence from which the jury might decide that there had been a false representation of a material fact (the main issue in the case), it is only necessary to add that there was also evidence, as we have set it out above, from which it would have been possible for the jury to have found the other essential elements of actionable fraud, which was all that was necessary to entitle the plaintiffs to have their case against Benton passed upon by the jury.

The trial judge was correct, we think, in granting the motions in favor of Halley and Storch. It is true that Garber was Halley's agent and there was testimony that he made almost the same statement concerning the sanitary system as that at-

tributed to Benton; but there was no showing that either Halley or Garber knew anything about the size of the system, or the permit issued for its installation, or that there was any obligation upon their part to have such knowledge. We are unable to discover in the record where the plaintiffs adduced any evidence against the appellee, Storch, that would support a finding of a single one of the essential elements of fraud on his part; hence the directed verdict in his favor was not only proper, but was required.

> *Judgments in favor of Storch and Halley affirmed; judgment in favor of Benton reversed and new trial awarded; appellants to pay two-thirds of the costs, and appellee Benton, one-third.*