WOLIN ET UX. *v.* ZENITH HOMES, INC., ET AL.

[No. 81, September Term, 1958.]

*Decided February 13, 1959.*

*Motion for rehearing filed March 11, 1959, denied March 13, 1959.*

The cause was argued before BRUNE, C. J., and HENDERSON, HAMMOND, PRESCOTT and HORNEY, JJ.

*Walter J. Cahill,* with whom was *Hanserd K. Presley* on the brief, for appellants.

*William C. Miller,* with whom were *Miller, Miller & Miller, H. Ralph Miller* and *James Robert Miller* on the brief, for appellees.

HORNEY, J., delivered the opinion of the Court.

When Frank and Linda Wolin (the Wolins) became dissatisfied with the newly constructed house they had purchased from Zenith Homes, Inc. (Zenith), they filed, in the Circuit Court for Montgomery County, an action in equity against Zenith and the president of the corporation for rescission of the contract of sale and cancellation of the deed instead of an action at law for damages. The chancellor, finding no fraudulent misrepresentation of a material fact which induced the purchasers to enter into the contract of sale and to accept delivery of the deed, dismissed the bill, and the Wolins appealed.

The contract to purchase the home, then under construction, in Silver Spring, Montgomery County, was executed on February 10, 1955. The signing of the contract followed an inspection of the property, and other houses located in

the Carroll Spring Subdivision, over a period of about twenty days. Final settlement for the property was made on March 10, 1955, prior to the date fixed in the contract therefor, and before work on the house had been completed.

During inspections of the house, both before and after the execution of the contract of sale, the Wolins noticed water in the basement. This, they claim, was represented to them at different times by the agents or officers of the owner as "condensation", the result of washing wheelbarrows, and because the lot on which the house was being constructed had not been graded. While the reason therefor was not stated, certain "further conditions" were appended to the contract of sale, including a guarantee that the basement would not leak within the period of one year from the date of final settlement. And, at the time of settlement, the Wolins demanded, and received, a "supplemental agreement" in the form of a letter from Zenith in which it was stated that Zenith, for the period of one year, "in consideration of * * * [the] purchase of * * * [the] property," guaranteed, among other things, that the basement would not leak and that, if settling of the house caused structural damage, other than normal plaster cracks and chips, such damage would be repaired.

Shortly after moving into the house, the Wolins began to discover "structural defects." There were numerous other defects, but their chief concern involved the seepage of water into the basement and the settling of the house. When complaints were made to it, Zenith tore up most of the basement floor, put in gravel and drain tile in the soft and porous subsoil beneath the floor and replaced the concrete. Broken floor joists were also replaced and the painting was retouched several times. But the infiltration of water did not cease and other structural defects continued to appear.

On April 14, 1955, the Wolins advised Zenith by registered letter that another contractor, at their request, had inspected the house and had made certain recommendations which they set forth in the letter. The contractor also suggested that the Wolins make an arrangement with Zenith to get out of the house they had purchased and into another on a higher elevation. The letter concluded with a warning that

"irrespective of what is done, we are not waiving the provisions of our contract of purchase and the supplemental agreement signed at the time we settled for the house." Zenith continued to do further work on the house. Whether this work was an effort to fulfill the recommendations set forth in the letter of April 14 does not clearly appear. But, when the Wolins—on April 21, 1955—demanded a rescission of the contract and cancellation of the deed, no further effort was made to remedy the defects.

The joint appendix does not disclose when the original suit was filed nor when or why an amended bill was necessary, but in the amended bill to set aside the conveyance, it is alleged that the Wolins had been informed by the agents and officers of Zenith before the contract was executed that the property purchased was owned by Nathan Goldberg; that the contiguous open area in the rear of the property purchased was owned by the State of Maryland and would always remain as an open area; that the house would be completed according to a plan and specifications in structurally sound condition and free of substantial defects; that the subsurface foundation walls were dry and well parged; that a bed of gravel had been placed under the basement floor; that the basement walls were dry and well parged and that the dampness then appearing on the basement walls and floor was "condensation"; and that the dwelling was worth $22,950. It was also alleged in detail, among other things, that the representations as to ownership, the contiguous open area and structural soundness—which the Wolins allege induced them to enter into the contract of purchase and to accept delivery of the deed—were false and fraudulent. Nathan Goldberg, the president and owner of at least a controlling interest in Zenith, was joined as a defendant on the ground that he had been represented, and had represented himself, as being the owner of the property and as being responsible for defective workmanship. The Wolins also claimed, as they alleged in the bill, that Zenith was dissipating its assets, that the corporation was defunct and that its president had dealt with the corporate property as if it were his own. The prayers for relief sought rescission of the contract, cancellation of the

deed and a return of the purchase price and expenses in connection with the transaction.

The chancellor, having overruled the defendants' demurrer to the amended bill, heard the case on its merits and dismissed the bill because he found the Wolins were not entitled to rescission of the contract on the grounds of fraud and misrepresentation. He was of the opinion, however, that the Wolins were entitled to recover damages against the defendants for the defective workmanship under the guarantees set forth in the supplemental agreement. But, when he suggested a suit at law for that purpose, or that he would—if and when an appropriate amendment was made—consider the question of damages under the prayer for general relief, he was advised that the Wolins wished to stand on their bill for rescission. Thereupon, the chancellor dismissed the bill. No provision was made in the decretal order for damages in lieu of rescission should the Wolins subsequently change their minds, which they have done on this appeal. Having declined to accept an award of damages in the lower court they cannot revive their claim therefor here.

At the hearing before the chancellor, and on this appeal, it appears that the Wolins, through indifference or otherwise, may have abandoned all of the alleged misrepresentations set forth in the bill except those concerning (i) ownership of the property, (ii) the contiguous open area and (iii) the structural unsoundness of the foundation walls and basement. Even if such other alleged misrepresentations had been vigorously pressed they would furnish no ground for relief. There was no reference in the original contract of sale to a plan or specifications to be followed by the builder nor any suggestion in the evidence that the purchasers had seen or examined any papers of that nature. Moreover, the other representations as to the soundness and value of the house are normally considered in law to be "indefinite generalities of exaggeration" which could deceive no rational person and therefore do not amount to "misrepresentation." See *Milkton v. French*, 159 Md. 126, 136, 150 A. 28 (1930). Cf. Pomeroy *Equity Jurisprudence* § 878 (5th ed., 1941). Thus, it is clear, we think, that the question before us does

not involve the quality *vel non* of the construction of the house, but simply whether the extraordinary powers of equity may be invoked to rescind the executed contract because one or more of the misrepresentations—which the Wolins still claim they relied on—induced them to enter into the contract to buy.

### (i). Representation as to Ownership.

The chancellor found that the Wolins did not rely on the representation that Nathan Goldberg (Goldberg) was the owner of the property. We agree. The Wolins asserted that, while Zenith was the purported owner, it was represented to them that the corporation was a mere "front" and that Goldberg would "take care of everything." They had heard of "collapsible" corporations and insist they would not have entered into the contract without assurances that Goldberg would be personally responsible for structural defects. Even if we assume, without deciding, that such representation was not required to be in writing as a promise to answer for the debt or default of another and further that the negotiations on this point were not merged in the supplemental agreement,[1] the Wolins testified that certain repair work had been done under Goldberg's supervision in response to their complaints and was still in progress when they demanded a rescission of the whole transaction. Such conduct precluded an inference that the representation that Goldberg would be personally responsible for structural defects was false. It is also significant, we think, that the letters sent by the Wolins to the owner were addressed to the corporation or to the officers thereof instead of to Goldberg as an individual. Under such circumstances it is unbelievable that the Wolins relied on the representation that Goldberg was the owner of the premises conveyed when the contract of sale, the deed and the supplemental agreement all showed that Zenith was the owner and the contracting party. *Clark v. Kirsner,* 196 Md. 52, 74 A. 2d 830 (1950). Cf. *Ace Development Co. v. Harrison,* 196 Md. 357, 76 A. 2d 566 (1950).

---

1. Cf. *Wagner v. Bing,* 163 Md. 496, 163 A. 199 (1932).

### (ii). Representation as to Contiguous Open Area.

Depending upon the circumstances in each case, a purchaser does have a right to rely on at least some representations made by a seller or his agent as to the nature or condition of surrounding properties, even though an examination of public land records would have disclosed that the representations were false. Cf. *The Glendale Corp. v. Crawford,* 207 Md. 148, 114 A. 2d 33 (1955); *Lake v. Thompson,* 366 Pa. 352, 77 A. 2d 364 (1951); Annotation, 33 A. L. R. 853 (1924). However, any misrepresentation as to the ownership of the contiguous open area in the rear of the property in this instance, when discovered, was not acted upon promptly, and was in fact waived by the conduct of the purchasers. See the discussion hereinafter set forth in part (iii) of this opinion with respect to another alleged representation. When the Wolins, after moving in, "started having trouble with the house," and also ascertained that the open area in the rear was not owned by the State or County, they did not call the attention of either Zenith or Goldberg to the misrepresentation, and, significantly, they neglected to even mention it in the letter of April 14, 1955, in which they set forth in detail their grievances as to the structural defects of which they complained. And, instead of claiming a prompt rescission for this misrepresentation as soon as it was discovered—as they should have done—they demanded only that Zenith make good its guarantees under the supplemental agreement. In so doing, we hold their conduct constituted a waiver which bars a rescission for any misrepresentation as to the contiguous open area. See *Telma v. Gingell, infra.*

### (iii). Representations as to Structural Soundness.

The chancellor found that the purchasers, having inspected the house several times, both before and after its purchase, prior to the acceptance and delivery of the deed, were aware of the conditions found, and that, even if the representations which were made as to the foundation walls and basement had been proved to be false, they did not constitute such fraud as would justify rescission. We find it unnecessary to

either agree or disagree with the finding of the chancellor. We will affirm for another reason.

The Wolins contend that they were not so much misled by the general assurances as to the structural stability of the foundation walls and the ultimate dry condition of the basement walls and floor as by the positive statements that the foundation walls were free of substantial defects and that there was a bed of gravel under the concrete floor. Subsequently it was discovered that the foundation walls were only eight inches thick instead of twelve inches as was required by the county building code, and that there was no gravel under the basement floor. The Wolins insist that these specific misrepresentations were ones which they could not have ascertained prior to the execution of the contract of sale and the delivery of the deed. Apparently the unlawful width of the foundation walls had not been discovered by the building inspector who had made ten inspections and finally approved the construction prior to the settlement date. It was also subsequently discovered that the subsurface water level outside the basement was only one foot below the surface and that the house had been built in a swamp. However, even if we assume, without deciding, that such misrepresentations were in fact false, that they were material and that the purchasers relied on them to their detriment, it is clear that the Wolins, by their conduct after the discovery of such false and fraudulent material representations, elected to ratify the transaction rather than rescind it.

In this State, as well as in other jurisdictions, it is settled that when a party to a contract discovers a fraud has been perpetrated upon him, he is put to a prompt election to rescind the contract or to ratify it and claim damages. 5 Williston *Contracts* § 1528 (Rev. ed., 1937); II *Restatement of Contracts* §§ 483, 484 (1932); *Sommers v. Dukes,* 208 Md. 386, 118 A. 2d 660 (1955); *Ortel v. Realty Company,* 171 Md. 678, 190 A. 239 (1937); *Telma v. Gingell,* 157 Md. 411, 146 A. 221 (1929); *Groff v. Hansel,* 33 Md. 161 (1870). Acts by a purchaser which constitute acquiescence, ratification or estoppel will preclude him from

rescinding the contract. See *Hoffman v. Seth,* 207 Md. 234, 114 A. 2d 58 (1955). In the *Telma* case we said at p. 413:

> "Upon the discovery * * * of the fraudulent misrepresentation, the purchaser had to elect between two rights. He was put to the choice of repudiating or ratifying the conveyance, although the transaction had been fully completed by conveyance and payment. If he adopted the first alternative he repudiated the conveyance and sought its rescission and a restoration of his situation before the contract; but if he chose the second, he ratified the grant but could obtain damages to redress the injury inflicted by the false and fraudulent representation. These rights were inconsistent and mutually exclusive, and the discovery put the purchaser to a prompt election."

It seems that in some instances even silence may indicate ratification. *Latrobe v. Dietrich,* 114 Md. 8, 78 A. 983 (1910); *Clements v. Smith,* 9 Gill 156 (1850). Cf. *Kandalis v. Paul Pet Constr. Co.,* 210 Md. 319, 123 A. 2d 345 (1956).

In a case such as this where the purchasers, instead of exercising the right to rescind the contract promptly upon the discovery of false and fraudulent misrepresentations, notified the seller they were not waiving the provisions of the contract of purchase and supplemental agreement, demanded that the seller make certain repairs and then accepted such repairs as had been made, it is clear the purchasers expressly elected to enforce the contract and supplemental agreement, and could not thereafter repudiate the transaction even though they should afterwards discover other circumstances connected with the same false and fraudulent misrepresentations. *Latrobe v. Dietrich, supra.* As we said in the *Telma* case, *supra,* at p. 415: "The acts were deliberately done and had but one significance, and, so, without reference to the vendee's actual intention to choose, an election resulted which was final. The law does not permit a mental reservation to qualify unequivocal acts, which imply a final choice and affirmation." See also *Restatement* § 484, *supra,* Illustrations 1 and 8.

For the reasons assigned, we think it is clear that the decretal order of the chancellor dismissing the bill must be affirmed.

*Decree affirmed, the appellants*
*to pay the costs.*